649 A.2d 613

EDITH BECKER, AS ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ALBERT BECKER, PLAINTIFF–RESPONDENT, v. BARON BROTHERS, COLISEUM AUTO PARTS, INC.; D & M AUTO PARTS; C & M AUTOMOTIVE WAREHOUSE, INC.; COUNTY AUTO PARTS; R & B AUTO SUPPLY; UNITED MOTORS PARTS, INC.; PARTS PLACE; TENAFLY FOREIGN & DOMESTIC CARS, INC.; MAREMONT, INC.; NUTURN, INC.; NATIONAL BRAKE BLOCK, INC.; SMS AUTOMOTIVE PRODUCTS, INC.; CONSOLIDATED UNIT; MORAK; ALLENDALE AUTOMOTIVE ENTERPRISE; MOTOR AGE WAREHOUSE; SUPREME AUTOMOTIVE WAREHOUSE; AUTOMOTIVE SYSTEMS, INC.; STATE CAR AND TRUCK PARTS WAREHOUSE; WHITE PLAINS/BWP DISTRIBUTORS, INC.; UCI DISTRIBUTION CENTER/UCI WAREHOUSE WESTCHESTER; RAYMARK CORPORATION AND RAYMARK INDUSTRIES, INC., AS SUCCESSOR TO RAYBESTOS–MANHATTAN; BENDIX CORPORATION; MOPAR; FORD MOTOR COMPANY; ABC; BORG WARNER; RAYLOC; EIS; WAGNER; PRIVATE BRANDS; VERA IMPORTED PARTS; SANYO AUTOMOTIVE; INTERCO PARTS CORPORATION; LUCAS INDUSTRIES INC.; I.A.P. IMPORTED PARTS; COLUMBIA MOTORS CORPORATION; GLOBE AUTO IMPORTS; EPE, INC.; AND JOHN DOE CORPORATIONS (A FICTITIOUS NAME REPRESENTING ONE OR MORE SUPPLIERS OR DISTRIBUTORS OF ASBESTOS CONTAINING PRODUCTS TO PLAINTIFF'S EMPLOYERS); AND RICHARD ROE CORPORATIONS (A FICTITIOUS NAME REPRESENTING ONE OR MORE MANUFACTURERS, OF ASBESTOS CONTAINING PRODUCTS), DEFENDANTS, AND GENERAL MOTORS CORPORATION (ORIGINALLY IMPLEADED AS DELCO) AND ENGLEWOOD BRAKE CO., INC., DEFENDANTS–APPELLANTS.

Argued November 29, 1993—Decided November 15, 1994.

*Rudy B. Coleman* argued the cause for appellant (*Carpenter, Bennett & Morrissey,* attorneys; *Mr. Coleman* and *Rosemary Alito,* of counsel; *Ms. Alito* and *Bonnie E. Bershad,* on the briefs).

*Robert E. Mensel* on behalf of appellant Englewood Brake Co., Inc., relies on the briefs and argument presented on behalf of appellant General Motors Corporation (*Hanlon, Lavigne, Herzfeld & Rubin,* attorneys).

*Bryan D. Garruto* argued the cause for respondent (*Garruto, Galex & Cantor,* attorneys; *Mr. Garruto* and *Frances A. Tomes,* of counsel; *Mr. Tomes,* on the brief).

*Thomas F. Campion* argued the cause for *amicus curiae,* Allied Signal, Inc. (*Shanley & Fisher,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

On the strength of *Beshada v. Johns–Manville Products Corp.*, 90 *N.J.* 191, 447 *A.*2d 539 (1982), the Appellate Division ruled that all asbestos products marketed without warnings are defective as a matter of law. It therefore affirmed the judgment of the Law Division, entered on a verdict by a jury that had been instructed that that was the law.

We granted the petitions for certification of defendant General Motors Corp., 134 *N.J.* 476, 634 *A.*2d 524 (1993), and of defendant Englewood Brake Company, Inc., —— *N.J.* ——, —— *A.*2d —— (1994), and now reverse.

I

Albert Becker was diagnosed in October 1984 as having contracted mesothelioma, a rare form of incurable cancer that affects the pleural membrane, the layer of cells surrounding the lungs and the chest cavity. He and his wife commenced this strict-liability, toxic-tort action in November 1985, seeking recovery from various miners, manufacturers, and sellers for personal injuries and consequent losses that they had sustained because of Becker's exposure to asbestos-containing products. After Albert Becker's death from mesothelioma at age fifty-five, in the course of this litigation, his wife added a count for her husband's wrongful death. Although she is correctly denominated the plaintiff, reference henceforth in this opinion to "plaintiff" is to Albert.

Plaintiff worked as an automobile mechanic for various employers from 1953 to 1967. In that year he opened his own service station, Tenafly Getty, which he operated until 1985. Throughout much of his career as a mechanic, Becker performed approximately one to five brake jobs per week and one to four clutch jobs per month. The products he used to perform those jobs did not provide any warnings regarding asbestos exposure until sometime around 1975, when manufacturers apparently began putting warnings on some of their products. Plaintiff was exposed to dust allegedly containing chrysotile-asbestos fibers as the result of his

work in the following ways: (1) through removal of old parts from cars to replace them with new ones, which caused dust to come off the old parts near his face; (2) through using a wire brush to clean the dust out of the parts or through washing the dust off the parts, which caused the dust eventually to settle to the floor, to dry, and to float around in his shop; (3) through sanding parts with grease on them, which caused dust to come off the brakes; and (4) through watching one of his distributors grind old parts on a lathe during the remanufacturing process, thereby releasing dust into the air.

All but three defendants, United Motor Parts, Inc., Englewood Brake Company, Inc. (Englewood Brake), and General Motors Corp. (General Motors) settled or were dismissed prior to trial. At the close of the case, plaintiff asked the court to rule that "an asbestos[-]containing friction product [that] is friable is defective as a matter of law if it contains no warnings." Because the court believed that all asbestos products without warnings are defective, it agreed with plaintiff's position. The court stated that whether processed chrysotile asbestos can cause mesothelioma "is a proximate cause defense. It has nothing to do with whether * * * a product that contains asbestos, more specifically chrysotile, can be marketed without a warning and be considered not defective." The court therefore told the jury before the attorneys' closing arguments:

> I've already ruled as a matter of law that some of the asbestos[-]containing friction products that were manufactured, sold and distributed by some of the defendants constituted an unsafe product. In other words, a defective product. The defect being the absence of any warning at all on these particular products. * * *. You must, therefore, accept that the asbestos products in this case are legally unsafe and defective products, those that contain no warnings at all.

In keeping with that ruling, the court placed the following preamble on the jury-verdict sheet: "This court has determined as a matter of law that those friction products containing asbestos which were manufactured sold and distributed *without* warnings were defective for the reason that they contained *no* warnings." The verdict sheet also asked the jury to determine whether "those asbestos-containing friction products which * * * *did* provide

warnings [were] defective because they failed to provide *adequate* warnings"; whether "exposure to the type of asbestos contained in the friction products [was] a proximate cause of Albert Becker's injury and death"; whether the "products manufactured, sold and distributed by the [specified defendants were] a substantial contributing factor in the cause of Albert Becker's injury and death"; and if so, then to allocate a percentage share of responsibility for each of those defendants.

The jury returned a verdict of $250,000 for plaintiff's pain and suffering, $500,000 for his wrongful death, and $250,000 for his wife's loss of consortium and services, finding defendants Englewood Brake and General Motors, as well as several other defendants that had settled, liable. Englewood Brake and General Motors then moved for, among other relief, a new trial. In denying the new-trial motions, the court stated that its basis for ruling that asbestos products without warnings are defective as a matter of law was "pretty much * * * judicial gut reaction and instinct as well as *Beshada.*"

On appeal, the Appellate Division, in an unreported opinion, affirmed the judgments against General Motors and Englewood Brake on the defect-as-a-matter-of-law issue. The Appellate Division rejected defendants' argument that *Beshada* "focused only on the state-of-the-art defense." The court found instead that "[t]he *Beshada* Court effectively concluded that asbestos products which are marketed without health warnings are defective as a matter of law." The Appellate Division cited one published opinion discussing the issue, *Campolongo v. Celotex Corp.*, 681 *F.Supp.* 261 (D.N.J.1988), which stated:

> The focus of *Beshada* was whether the product was defective for lack of a warning. * * *. *Beshada* survives but is limited to the circumstances giving rise to its holding. Since New Jersey chooses to treat asbestos cases differently than other product liability cases, it does not require a quantum leap for this court to suggest that, as a matter of law and policy, an asbestos-related product without a warning is a defective product.
>
> [*Id.* at 264 (citation omitted).]

The court also rejected General Motors' "argument that *Beshada*'s absolute liability principle has no pertinence here because the product was fabricated brake linings, not bulk asbestos." It concluded that "[t]he form of the asbestos product, whether raw fiber in bags or in a finished product, is not controlling in determining whether the asbestos product is defective as a matter of law. The key consideration is whether the asbestos product was marketed without a warning."

## II

Because this case was filed before the enactment of the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –7, that legislation does not guide our decision in this case. *See L.* 1987, *c.* 197, § 8 (stating that act applies only to products-liability actions filed after date of enactment, July 22, 1987); *Herman v. Sunshine Chem. Specialties Co.*, 133 *N.J.* 329, 335, 627 *A.*2d 1081 (1993) (same).

This strict-products-liability case is based on an inadequate-warning theory. Strict liability "imposes liability for injury to another's person * * * without any consideration of the defendant's intent to commit the act or cause the injury, or of his moral blameworthiness." *Fischer v. Johns–Manville Corp.*, 103 *N.J.* 643, 652–53, 512 *A.*2d 466 (1986). Successful assertion of a cause of action in strict products liability requires that a plaintiff prove several elements: "that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." *Feldman v. Lederle Labs.*, 97 *N.J.* 429, 449, 479 *A.*2d 374 (1984); *see also O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179, 463 *A.*2d 298 (1983) (same); *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394, 451 *A.*2d 179 (1982) (same).

A manufacturer has "a duty to produce and distribute a product that is reasonably fit, suitable, and safe. It has not met that obligation if it puts a defective article into the stream of commerce that causes injury * * * ." *Feldman, supra,* 97 *N.J.* at 450, 479 *A.*2d 374. A failure to warn, or a failure to warn

properly, can constitute a defect in a product sufficient to support an action in strict liability. *See id.* at 449, 479 *A.*2d 374 (stating that "defect may take one of three forms: a manufacturing flaw, a design defect, or an inadequate warning"); *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 236–41, 432 *A.*2d 925 (1981) (holding that inadequate warning could constitute design defect); *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 176, 406 *A.*2d 140 (1979) ("[A] product may be unsafe because of inadequate instructions."). "[A]n adequate warning is one that includes the directions, communications, and information essential to make the use of a product safe." *Freund, supra,* 87 *N.J.* at 243, 432 *A.*2d 925.

In general, courts approach the question of whether a product is defective through the risk-utility analysis, a standard "based on a comparison of the utility of the product with the risk of injury that it poses to the public * * *." *O'Brien, supra,* 94 *N.J.* at 181, 463 *A.*2d 298. "In the case of a design defect consisting of an inadequate warning, * * * imposing the requirements of a proper warning will seldom detract from the utility of the product." *Freund, supra,* 87 *N.J.* at 238 n. 1, 432 *A.*2d 925.

In respect of causation in asbestos failure-to-warn cases, a plaintiff must prove two types of causation: product-defect causation and medical causation. Product-defect causation means that the absence of a warning proximately caused the plaintiff's injury, and medical causation means that exposure to the *defendant's* asbestos proximately caused the injury. *Coffman v. Keene Corp.,* 133 *N.J.* 581, 594, 628 *A.*2d 710 (1993).

Generally, the emphasis in strict-products-liability analysis is on the safety of the product, not on the reasonableness of a defendant's conduct. *Feldman, supra,* 97 *N.J.* at 450, 479 *A.*2d 374. Thus, in most cases, strict liability is different from negligence. In a strict-liability case "the defendant is assumed to know of the dangerous propensity of the product, whereas in a negligence case, the plaintiff must prove that the defendant knew or should have known of the danger." *Ibid.* In cases in which the

defect alleged is failure to warn, however, strict-liability analysis becomes similar to negligence analysis. *Id.* at 451, 479 *A*.2d 374. The reasonableness of a defendant's conduct becomes a factor to consider. *Ibid.* The question in such cases is whether, "assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or providing the warnings given." *Ibid.; see Fischer, supra,* 103 *N.J.* at 654, 512 *A*.2d 466. A court will assume that "the defendant knew of the dangerous propensity of the product, if the knowledge that is assumed is reasonably knowable in the sense of actual or constructive knowledge." *Id.* 97 *N.J.* at 454, 479 *A*.2d 374.

■ To refute the assumption of knowledge of the dangerous propensity of a product, a defendant usually may present state-of-the-art evidence—that is, evidence that a product's danger was scientifically undiscoverable at the time the defendant distributed the product. *See Fischer, supra,* 103 *N.J.* at 656, 512 *A*.2d 466 ("[T]he effect of the 'state-of-the-art' defense is to permit a defendant to rebut the presumption of knowledge of its product's harmful propensities * * * by proving the impossibility of knowledge, even by experts in the field."). However, in *Beshada, supra,* 90 *N.J.* 191, 447 *A*.2d 539, a case involving injuries from exposure to various asbestos products, the Court held that the state-of-the-art defense was unavailable. But in *Feldman, supra,* a strict-products-liability case involving prescription drugs, the Court restricted *Beshada* "to the circumstances giving rise to its holding." 97 *N.J.* at 455, 479 *A*.2d 374. Accordingly, the Court allowed the presentation of state-of-the-art evidence.

In this case, the Appellate Division affirmed the trial court's determination that any friction product that contains asbestos is defective if it does not provide a warning. That ruling adopts as a matter of law the proposition that the utility of asbestos-containing friction products outweighs the risk that those who use them will contract mesothelioma and that a warning about that risk would have made the products safer without impairing their utility.

Underlying that conclusion is the assumption, then, that in fact a risk exists that users of friction products will contract mesothelioma. The court relied on *Beshada, supra,* 90 *N.J.* at 209, 447 *A.*2d 539 (stating in case involving asbestos products that "[w]e are saying that defendants' products were not reasonably safe because they did not have a warning"), believing that *Feldman, supra,* 97 *N.J.* at 455, 479 *A.*2d 374 ("We do not overrule *Beshada,* but restrict *Beshada* to the circumstances giving rise to its holding."), means that *Beshada*'s statement that asbestos products without warnings are not reasonably safe applies to all asbestos cases.

### III

We conclude that the Appellate Division's ruling that any friction product that contains asbestos is defective if it does not contain a warning is based on a misreading of *Beshada.* The primary flaw in the Appellate Division's analysis is its assumption, derived from its understanding of *Beshada,* that all asbestos products are dangerous and unsafe. That assumption is dispelled by a detailed examination of the record in this case, which reveals that different types of asbestos pose different health hazards. That examination makes abundantly clear that whether the processed chrysotile in brake products poses a risk of causing mesothelioma in the users of those products was a sharply-disputed issue of fact at trial.

Chrysotile asbestos is the type of asbestos used in brake linings. Another type is amphibole asbestos. Amphiboles have long, straight, inflexible fibers that are resistant to corrosion and that the body can retain for a lifetime. About ten percent of commercially-used asbestos consists of two types of amphiboles: amosite and crocidolite. Chrysotile asbestos, on the other hand, consists of short, flexible, corkscrew-shaped fibers that have numerous subunits, called fibrils, that break down readily in the body. Chrysotile asbestos comprises about ninety percent of asbestos that is commercially used in this country. Chrysotile can be

contaminated with a number of carcinogenic substances, including tremolite.

No witness at trial appeared to dispute that amphiboles can cause mesothelioma. Moreover, even a defense expert admitted that *non*-processed chrysotile may cause mesothelioma (although he attributed mesotheliomas resulting from such exposure to the presence of contaminants, tremolite or actinolite, contained in the raw chrysotile fiber). The parties presented conflicting evidence, however, about whether *processed* chrysotile can cause the disease.

Dr. Daum, plaintiff's medical expert, certified in internal medicine and preventive and occupational medicine, testified in support of her conclusion that "[b]rake mechanics are definitely at risk of getting mesothelioma from their exposure to asbestos in brakes." Dr. Daum explained that only ninety percent of asbestos that gets into the lungs escapes from the body through coughing. Thus, inasmuch as an average factory worker breathes in millions of asbestos fibers in an eight-hour day, the body retains many fibers, which invade the tissue surrounding the air sac, the interstitium, causing scar tissue and asbestosis. She further explained that the fibers migrate from there to the pleura, the lining of the lung and chest wall that lubricates and seals the lung, causing mesothelioma. Dr. Daum testified that a microscopic examination of the pleura will not show the presence of chrysotile fibers, but their absence on examination does not support the conclusion that they were never there. Although mesothelioma has a long latency period from the first exposure (the latency period averages approximately twenty-five to thirty years, although ranges as short as nine and as long as fifty years have been documented), chrysotile fibers eventually break down and leave the body; autopsies reveal scar tissue and the presence of tremolite, a contaminant, indicating that chrysotile was in the pleura.

In contrast, a defense expert, Dr. Craighead, a pathologist and epidemiologist, concluded that "no epidemiological evidence [exists] to indicate that processed chrysotile has the capacity to

produce mesotheliomas in man," although he acknowledged that he had written in one publication that epidemiological studies indicate that occupational groups exposed to chrysotile asbestos have a "low order of risk" for contracting the disease. He explained that the shape of chrysotile fibers would cause them to tend not to enter the pleura and cause mesothelioma in the manner that Dr. Daum had described. He noted that amphiboles, because they are straight, thin fibers, do penetrate deep into the lungs to the periphery, along the pleural lining where mesothelioma starts. Chrysotile, however, generally does not travel as far toward the pleura because of its curly shape. Accordingly, chrysotile fibers accumulate centrally in the lungs, break into smaller fibers, and get removed by macrophages, the mucociliary escalator, and lymphatics.

Dr. Daum concluded that eighty-five to one-hundred percent of mesotheliomas are caused by asbestos exposure. She also testified that although the remaining fifteen percent have no known cause, she believed they could be attributed to asbestos in the atmosphere. Dr. Craighead, on the other hand, believed that the percentage of mesotheliomas with unknown causes was twenty to forty percent. Dr. Daum acknowledged on cross-examination that she believed that fiberglass, or glass fibers of a certain size, or radiation also could cause mesothelioma.

The experts also disagreed about the conclusiveness of a number of case and epidemiological studies regarding asbestos exposure and mesothelioma. Dr. Daum testified about studies showing in various contexts, including studies of workers in mines, factories, and garages, that people exposed to asbestos later contracted mesothelioma. Dr. Craighead countered that many of those studies were not conclusive in respect of processed chrysotile because many of the people in those studies who had developed the disease had also been exposed to amphiboles or to raw chrysotile with contaminants. As Dr. Daum admitted, many of the studies on which she relied did not differentiate between types of asbestos fibers. Finally, Dr. Wong, an epidemiologist, testified for the

defense that the studies Dr. Daum had cited relating specifically to garage mechanics contracting mesothelioma did not actually show an increased risk of mesothelioma for mechanics; the same or fewer number of mesothelioma cases had occurred among the garage mechanics as had occurred in the background, non-asbestos-exposed population.

Concerning animal testing, Dr. Daum noted that one study showed that injecting inorganic fibers of chrysotile's size into animals caused mesothelioma. Dr. Craighead agreed that injecting large amounts of chrysotile into the abdominal cavity of rats could cause mesothelioma, but he concluded that the results of animal studies are not totally translatable in respect of humans; such studies may show how mesotheliomas develop but they are "artificial situations that don't speak to the question of what types of asbestos cause mesothelioma." The same experiment as had used rats as the subject did not cause mesothelioma when conducted on hamsters and mice.. Moreover, although injecting fiberglass, aluminum, and talc into rats causes mesothelioma in those animals, no evidence has shown that those three substances cause mesothelioma in humans.

The testimony was further in conflict on whether plaintiff could have been exposed to chrysotile asbestos from working with brake shoes. Plaintiff's expert, Dr. Frasca, who had examined a number of unused brake shoes with an electron microscope and with an energy-dispersive x-ray, testified that he had detected chrysotile-asbestos fibers in the new brake shoes. He also testified that half of the chrysotile fibers he had seen were of respirable size (smaller than one-hundred microns), and that more than ten percent of the chrysotile fibers on the surface of the products were potentially friable, that is, they had the ability to become airborne if the surface was touched or disturbed in some way. Dr. Daum testified that one to fifteen percent of the chrysotile survived the braking process.

On the other hand, a defense witness, Dr. Krebs, General Motors' director of toxic materials, who held a Ph.D. in industrial

health, testified that although most brakes have approximately fifty-percent chrysotile asbestos, more than ninety-nine percent of that fibrous chrysotile is converted to non-fibrous asbestos by the extreme heat of the braking process, meaning that used-brake dust contains less than one-percent fibrous chrysotile asbestos. Moreover, after studying the air in the service stations of several General Motors dealerships, he determined that the level of fibers in the air was under the threshold limit value for chrysotile established by the Conference of Governmental Industrial Hygienists (two fibers per cubic centimeter of air) and under the OSHA permissible exposure limit for all asbestos (two fibers greater than five micrometers in length per cubic centimeter). Those standards represent the level at which those organizations have determined that adverse health effects will occur.

Defendants also offered an alternative explanation for the cause of plaintiff's disease in the form of a different asbestos exposure. From the time of his boyhood, plaintiff had enjoyed mineralogy. In pursuit of his hobby he had collected rocks, including a sample of mineral asbestos. That hobby also took him to quarries, which may have contained asbestos, just after the quarries had been blasted.

## IV

We have recapitulated in such detail the testimony of the various experts only to put beyond question that the trial revolved around a factual dispute over whether the dust from brake products can cause mesothelioma. In sum, plaintiff's expert Dr. Daum testified in support of the propositions that garage mechanics are at risk of contracting the disease, that chrysotile asbestos can cause mesothelioma in humans, and that brake dust contains chrysotile. Defense experts, on the other hand, expressed the view that processed chrysotile does not cause mesothelioma and that used-brake dust contains chrysotile only in amounts under established safety standards. Confronted with that disagreement, the trial court should have permitted the jury to resolve the

disputed issue of fact in respect of the dangers of the asbestos product involved in this case before moving to application of the risk-utility test. *See, e.g., O'Brien, supra,* 94 *N.J.* at 184, 463 *A.*2d 298.

■ Ordinarily, in respect of the risk-utility analysis, if the parties present conflicting proofs, the fact-finder is to determine whether a defect exists. See *Soler v. Castmaster, Division of H.P.M. Corp.,* 98 *N.J.* 137, 153–54, 484 *A.*2d 1225 (1984) ("[I]t is the jury that must * * * determine whether th[e] duty [to manufacture a product that is suitably safe for its intended or anticipated purposes under the risk-utility standard] has been breached."); *Johnson v. Salem Corp.,* 97 *N.J.* at 78, 89, 477 *A.*2d 1246 ("Ordinarily the jury should be permitted to determine whether 'the risks of injury so outweighed the utility of the product as to constitute a defect.' " (quoting *O'Brien, supra,* 94 *N.J.* at 184, 463 *A.*2d 298)).

A ruling that all asbestos-containing products without warnings are defective as a matter of law presumes that all asbestos-containing products pose the same risks about which the users of those products must be warned, regardless of the differences in those products. This Court, however, has ruled that the risk-utility analysis should focus on the specific product before the court. See, *e.g., Feldman, supra,* 97 *N.J.* at 447, 479 *A.*2d 374 (stating that whether product "is unsafe should be decided on a case-by-case basis"); *O'Brien, supra,* 94 *N.J.* at 183, 463 *A.*2d 298. ("Where a particular product falls on the risk-utility continuum will depend on the facts of each case."). In addition, the use of a product-by-product approach rather than a categorical one is supported by commentators. *See generally* James A. Henderson, Jr. and Aaron D. Twerski, *Closing the American Product Liability Frontier: The Rejection of Liability Without Defect,* 66 *N.Y.U.L.Rev.* 1263, 1314–15 (1991) (pointing out that product-category law is not currently governing law in any jurisdiction).

The evidence presented in this case demonstrates why the analysis should focus on the specific product before the court. First, as various experts testified, two types of asbestos, with

different physical characteristics and different dangers, exist. The generic term "asbestos" does not describe just one material; it can refer to chrysotile or to amphibole. No one disputed at trial that the long, straight, difficult-to-dissolve amphibole fibers can migrate to the pleura and cause mesothelioma. The parties presented conflicting evidence, however, about whether the serpentine-shaped, easy-to-break-down chrysotile fibers can cause the disease. Second, the term "asbestos-containing products" describes a variety of materials with differing amounts of asbestos and different built-in safeguards. For example, in this case, plaintiff did not allege that he had been exposed to bags of raw fiber; rather, he alleged that he had been exposed to dust from brake parts, which contained only approximately fifty-percent fibrous chrysotile when new, more than ninety-nine percent of which may have become non-fibrous during the braking process. The experts appeared to agree that a person exposed to raw chrysotile fiber may have an increased risk of contracting mesothelioma, but they hotly disputed whether brake dust could cause the disease. Accordingly, a ruling that all asbestos products are the same appears to confound reality.

Our courts have acknowledged that asbestos-containing products are not uniformly dangerous and thus that courts should not treat them all alike. For example, in *Sholtis v. American Cyanamid Co.*, 238 *N.J.Super.* 8, 568 *A.*2d 1196 (App.Div.1989), the court had to determine whether to apply market-share liability in a case in which plaintiff had been exposed to various asbestos products during a four-decade career at American Cyanamid "first as mill operator, then as maintenance laborer, pipefitter's helper, junior mechanic and finally as an area mechanic." *Id.* at 14, 568 *A.*2d 1196. Market-share liability is defined as follows: "Where *multiple defendants have all produced the same or similar products,* but plaintiff has been exposed to but one or some of them, and through circumstances beyond plaintiff's control, it cannot be determined which manufacturer supplied the product that injured plaintiff, liability may still be found * * *." *Id.* at 22, 568 *A.*2d 1196 (emphasis added). The court declined to apply such liability,

however, stating that "[t]he nature of the asbestos products undoubtedly hampers the use of a market-share approximation of responsibility * * *." *Id.* at 24, 568 *A.*2d 1196. The court also acknowledged "the varying degrees of toxicity of different asbestos products." *Ibid.; see also Shackil v. Lederle Labs.*, 116 *N.J.* 155, 168, 561 *A.*2d 511 (1989) (declining to adopt market-share liability in vaccine context and noting that most courts decline to apply market-share liability in asbestos context because " 'products containing asbestos are not uniformly harmful—many products contain different degrees of asbestos' " (quoting *Starling v. Seaboard Coast Line R.R. Co.*, 533 *F.Supp.* 183, 191 (S.D.Ga. 1982))).

The decisions of courts from other jurisdictions also support the view that because asbestos products are not uniformly harmful, courts should not treat those products as a monolithic group. See, *e.g., Robertson v. Allied Signal, Inc.*, 914 *F.*2d 360, 379–80 (3d Cir.1990) (declining to impose market-share liability in asbestos context for number of reasons, including that " 'different manufacturers' asbestos products differ in degrees of harmfulness' " (quoting *Vigiolto v. Johns–Manville Corp.*, 643 *F.Supp.* 1454, 1464 (W.D.Pa.1986))); *Gideon v. Johns–Manville Sales Corp.*, 761 *F.*2d 1129, 1145 (5th Cir.1985) ("[A]ll asbestos-containing products cannot be lumped together in determining their dangerousness."); *University System of N.H. v. United States Gypsum Co.*, 756 *F.Supp.* 640, 656 (D.N.H.1991) (agreeing with "[m]ost courts, [which] have refused to apply market-share liability in asbestos cases due to the 'non-fungibility' of asbestos"); *Mullen v. Armstrong World Indus.*, 200 *Cal.App.*3d 250, 246 *Cal.Rptr.* 32, 36–37 (1988) (declining to apply market-share liability in asbestos context because asbestos products are not made from same formula, come in various forms, and carry different risks of harm); *Celotex Corp. v. Copeland*, 471 *So.*2d 533, 538 (Fla.1985) ("Asbestos products * * * have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others."); *Goldman v. Johns–Manville Sales Corp.*, 33 *Ohio St.*3d 40, 514 *N.E.*2d 691, 697 (1987) (declining to apply alternative or market-

share liability in asbestos context because "[a]sbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities, even in the same class of product").

Finally, we conclude that *Beshada, supra,* 90 *N.J.* 191, 447 *A.*2d 539, should not have stood in the way of a jury deciding the disputed issue of the dangers of the asbestos involved in this case. The Appellate Division determined that because of *Feldman*'s limitation of *Beshada* to "the circumstances giving rise to its holding," 97 *N.J.* at 455, 479 *A.*2d 374, *Beshada*'s statement that the asbestos products in that case "were not reasonably safe because they did not have a warning," 90 *N.J.* at 209, 447 *A.*2d 539, renders all asbestos products without warnings defective as a matter of law. That conclusion represents a much too broad reading of the *Beshada* opinion.

*Beshada* involved six consolidated strict-liability, failure-to-warn cases against manufacturers and distributors of asbestos products. *Id.* at 196, 447 *A.*2d 539. The suits involved the following asbestos-containing articles: unspecified "asbestos, asbestos products or asbestos materials" used by employees of Jersey Central Power and Light Company, *id.* at 197–98, 447 *A.*2d 539; insulation products used by pipefitters; unspecified products used by employees of Research Cottrell, Inc.; finished asbestos products used by an electrician; and other insulation products. *Id.* at 198, 447 *A.*2d 539. The Court framed the issue as follows: "The sole question here is whether defendants in a product liability case based on strict liability for failure to warn may raise a 'state of the art' defense." *Id.* at 196, 447 *A.*2d 539.

The Court held that use of the state-of-the-art defense in failure-to-warn cases was impermissible. See *id.* at 204 n. 6, 447 *A.*2d 539 (summarizing opinion's holding by stating that "[w]e hold in this case that a state-of-the-art defense should not be allowed in failure to warn cases"). The Court reasoned that precluding the use of the state-of-the-art defense would prevent the infusion of negligence principles into strict liability, *id.* at 204, 447 *A.*2d 539,

and would promote a number of policy concerns, *id.* at 205–08, 447 A.2d 539. Thus, the Court concluded as follows:

Failure to warn of a risk which one could not have known existed is not unreasonable * * *. But this argument is based on negligence principles. We are not saying what defendants should have done. That is negligence. *We are saying that defendants' products were not reasonably safe because they did not have a warning.* Without a warning, users of the product were unaware of its hazards and could not protect themselves from injury.

[*Id.* at 209, 447 A.2d 539 (emphasis added).]

Two years after *Beshada*, the Court was again confronted with the state-of-the-art-defense issue in *Feldman, supra*, 97 *N.J.* 429, 479 A.2d 374. In that case, the question presented was whether "the doctrine of strict products liability should apply to prescription drugs." *Id.* at 434, 479 A.2d 374. After concluding that strict liability could apply to manufacturers of prescription drugs, *id.* at 441–49, 479 A.2d 374, the Court moved to the strict-liability analysis itself. In that analysis, the Court addressed *Beshada*'s holding in respect of the state-of-the-art defense and concluded that "[t]he rationale of *Beshada* is not applicable to this case. We do not overrule *Beshada*, but restrict *Beshada* to the circumstances giving rise to its holding." *Id.* at 455, 479 A.2d 374. Accordingly, we concluded that the defendants should be permitted to present state-of-the-art evidence.

The Appellate Division in this case determined, based on *Feldman*, that "the *Beshada* decision continues to be sound precedent in asbestos litigation." That determination is correct in respect of its state-of-the-art-defense holding. *See Fischer, supra*, 103 *N.J.* at 656, 512 A.2d 466 ("Under the holding of *Beshada* a defendant is precluded and a plaintiff is relieved, on the liability aspect of an asbestos, strict-liability, failure-to-warn case, from introducing evidence relating to a defendant's actual knowledge or the state of knowledge in the asbestos field at the time of distribution."). But this case is not about state-of-the-art evidence. Rather, we must determine whether the statement in *Beshada* that "defendants' products were not reasonably safe because they did not have a warning," 90 *N.J.* at 209, 447 A.2d 539, has any binding effect for

other cases involving asbestos-containing products the hazards of which are genuinely disputed.

Significant for today's purposes is the procedural posture of *Beshada* when it reached this Court, namely, on interlocutory appeal by the plaintiffs from the trial court's denial of their motions to strike the state-of-the-art defense. Neither the briefs in that case, which we have examined, nor this Court's opinion anywhere suggest that at that stage of the proceedings any party had raised any issue concerning the dangerous nature of the defendants' products or had questioned that exposure to those products could cause asbestosis or mesothelioma, the diseases that the *Beshada* plaintiffs had allegedly contracted. The parties' arguments and the Court's discussion were directed solely to the issue of "whether the medical community's presumed unawareness of the dangers of asbestos is a defense to plaintiffs' claims." *Id.* at 197, 447 *A.*2d 539. Hence, in *Beshada*, the Court was not confronted with conflicting proofs, or even assertions, that the asbestos products there involved were not in fact dangerous or that without a warning the risks of those asbestos products outweighed their utility.

In this case, however, informed by a voluminous trial record, we are faced with a hotly-contested threshold factual issue, namely, whether the brake products that defendant used are dangerous. Accordingly, the jury should have determined that issue before the court moved to the risk-utility standard. *Beshada*, which was based on different facts, does not require a contrary result.

We are aware that the federal district court for the District of New Jersey has concluded that *Beshada* requires courts to find that asbestos products without warnings are defective as a matter of law. In *Campolongo, supra*, 681 *F.Supp.* 261, in the context of a suit for damages for exposure to an array of asbestos products that allegedly caused the plaintiff, an insulation contractor, to contract mesothelioma, that court concluded:

> Since New Jersey chooses to treat asbestos cases differently [from] other product liability cases, it does not require a quantum leap for this court to suggest that, as a

matter of law and policy, an asbestos-related product without a warning is a defective product. We have moved beyond the risk-utility analysis and past concern of whether the benefit outweighs the risk.

[*Id.* at 264.]

Although we often look to the decisions of federal courts for guidance, we are not bound by their decisions in respect of our own state law. They are bound by ours. *See Fleck v. KDI Sylvan Pools, Inc.,* 981 *F.*2d 107, 113 (3d Cir.1992) (stating that in reaching decision under state law, "Absent clear guidance from the [state] Supreme Court, [a federal court] must predict how it would decide the issues * * *"), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 1645, 123 *L.Ed.*2d 267 (1993); *see also West v. American Tel. & Tel. Co.,* 311 *U.S.* 223, 236–37, 61 *S.Ct.* 179, 183, 85 *L.Ed.* 139, 144 (1940). Regarding the issue in this case, the district court merely anticipated incorrectly this Court's ruling in respect of whether all asbestos-containing products are presumed to be dangerous and therefore defective as a matter of law if not provided with warnings.

In light of the distinction between this case and *Beshada,* the question that may fairly be posed is whether an asbestos product that *is* dangerous is defective as a matter of law if it does not provide a warning. We acknowledge that if "there is a fact question whether the risks outweigh the utility of a product, then the matter is for the trier of fact." *O'Brien, supra,* 94 *N.J.* at 186, 463 *A.*2d 298. However, we recognized in the same decision that "[i]f the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility, or vice versa, then the court could make the appropriate determination as a matter of law." *Ibid.*

We believe that products-liability-case defendants will rarely, if ever, be able to produce any evidence demonstrating that a dangerous asbestos product marketed without a warning of its hazards or the need for precaution to overcome the risks attendant on its use is not defective. Reasonable people would not likely differ on whether such a warning, one that could improve the safety of the product without impairing or destroying its useful-

ness, is required. In cases "of a design defect consisting of an inadequate warning, * * * imposing the requirements of a proper warning will seldom detract from the utility of the product." *Freund, supra,* 87 *N.J.* at 238 n. 1, 432 *A.*2d 925. As applied to an asbestos product shown to be dangerous, the observation in *Campolongo* is well taken:

> Experience demonstrates that an asbestos-related product is unsafe because a warning could have made it safer at virtually no added cost and without limiting its utility. Indisputably, a warning would have lessened exposure and avoided countless injuries.

[681 *F.Supp.* at 264.]

If, in this case, the friction products containing asbestos are found to be dangerous and the evidence does not indicate that a warning would render the products useless or worthless, the trial court could properly find the asbestos products defective as a matter of law. Of course, such a determination would not itself encompass the issue of proximate cause or obviate the need for a determination by the jury of whether the failure-to-warn defect constituted a proximate cause of plaintiff's fatal mesothelioma. *See Coffman v. Keene Corp., supra,* 133 *N.J.* at 594, 628 *A.*2d 710.

Accordingly, we are satisfied that the Appellate Division's determination, which approved the trial court's charge to the jury, that all asbestos-containing products without warnings are defective as a matter of law was error. That error deprived the jury of the opportunity to determine whether the asbestos product was in fact dangerous, and rendered premature and unfounded the court's application of the risk-utility analysis and its conclusion that without a warning the asbestos product was defective as a matter of law. Inasmuch as the parties presented conflicting evidence on the issue of dangerousness and did not have the opportunity to introduce or develop any evidence bearing on, or to argue, whether the failure to warn can raise a genuine dispute over the defectiveness of such a product, the case must go back for retrial.

V

Judgment reversed. The cause is remanded to the Law Division for retrial, costs to abide the event.

*For reversal and remandment* —Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—5.

*Opposed* —None.