282 N.J. Super. 373 (1995)
660 A.2d 521
PAULINE RIPA, EXECUTRIX OF THE ESTATE OF PETER RIPA, DECEASED, AND PAULINE RIPA, IN HER OWN RIGHT, PLAINTIFF-RESPONDENT,
v.
OWENS-CORNING FIBERGLAS CORPORATION, DEFENDANT-APPELLANT, AND OWENS-ILLINOIS COMPANY, GARLOCK, INC.; KEENE CORPORATION; GAF CORPORATION; ARMSTRONG WORLD INDUSTRIES, INC.; JOHN DOE CORPORATION (ONE THROUGH TEN), DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1995.
Decided June 5, 1995.
Supplemental Briefs April 24, 1995.
*378 Before Judges DREIER, VILLANUEVA and WEFING.
Larry L. Simms, admitted pro hac vice, argued the cause for appellant (Tucker, Biegel & Goldstein, attorneys; Andrew Constantine, II, of counsel, Frederick E. Blakelock, on the brief).
James J. Pettit argued the cause for respondents (Greitzer & Locks, attorneys; Mr. Pettit, on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant Owens-Corning Fiberglas Corp. appeals from a compensatory damage award in favor of plaintiff of $380,344.50, including prejudgment interest, and from a punitive damage award of $5,500,000. Owens-Corning was one of ten asbestos manufacturer defendants in plaintiff's wrongful death and survival action based upon Owens-Corning's and the other defendants' alleged failure to provide proper warnings concerning their asbestos products. Specifically, Owens-Corning was charged with the manufacture and distribution of an allegedly unsafe asbestos product called Kaylo.
There is no question that decedent, Peter Ripa, developed severe asbestosis as a result of exposure to asbestos products and that he further had quadruple bypass surgery, the combination of which had totally disabled him from working at some point between 1988 and 1990. In late 1991, he developed chronic rib pain and had lung surgery performed in April 1992. He was diagnosed with mesothelioma, an asbestos-based cancer.[1] The *379 mesothelioma provided the sole basis for plaintiff's claims against Owens-Corning. It was this disease that caused decedent to undergo radiation therapy and allegedly forced him to cease performing even simple tasks around the house. Although at the time of his death he was sixty-four years old, Ripa and his wife of forty years still had a minor daughter living at home who did not graduate from high school until 1993. Decedent died on September 26, 1992, and plaintiffs in this case are his estate and widow (collectively referred to as "plaintiff"). Decedent testified through a de bene esse deposition.
Ripa worked at New York Shipyard in Camden from 1950 until 1957 as a mechanic's helper and machinist. He worked on board ships for forty to fifty percent of his time while asbestos pipe covering was being cut. The workplace was filled with asbestos dust which also covered his clothes. Another shipyard worker with whom decedent worked estimated that forty to forty-five percent of the products he saw causing the asbestos dust to fly in their workspace were products of Owens-Corning. He also ascribed percentages to various other manufacturers. He noted that the Kaylo product prior to 1957 had an Owens-Illinois label and after that an Owens-Corning label.[2]
*380 Between 1953 and 1958 Owens-Corning only distributed the Owens-Illinois product but after 1958 manufactured the Kaylo itself. Some of the Kaylo product even carried the Owens-Corning logo between 1956 and 1958. Kaylo was principally used for insulation purposes, and decedent testified in his de bene esse deposition that he saw the products but never saw any warnings about use of asbestos. Had he seen them, he would have taken them seriously.
The history of the literature warning of the dangers of asbestos and Owens-Corning's knowledge thereof have relevance to the punitive damage claim. The hazards were first mentioned in scholarly literature in 1917 with many articles following. The first case of mesothelioma was reported in 1947, and by the mid-1950's a study of British textile workers associated asbestosis with a risk of lung cancer. When Owens-Illinois developed Kaylo, it asked that Saranac Laboratories conduct a study of the health effect of inhaling Kaylo both from the standpoint of the employees where the product was made and employees using the product. The first part of the study covering manufacturers' employees was completed, but apparently there were no user tests conducted. Although the initial results of the studies showed no effect on laboratory animals with up to two years' exposure, a November 16, 1948 letter from Saranac Laboratories to Owens-Illinois noted a change in the findings in that after thirty months' exposure to Kaylo dust, there was "unmistakable evidence of asbestosis ... showing that Kaylo on inhalation is capable of producing asbestosis and must be regarded as a potentially-hazardous material."
At first Owens-Illinois was concerned, but it then discounted the initial Saranac results due to the high and continuous degree of exposure the laboratory animals had received. William Hazard, Owens-Illinois' industrial hygienist, however, acknowledged that asbestos-related diseases did not develop quickly and that the Saranac study could be comparable to real-life experience. He testified that it was generally believed in the 1940's that asbestos might present a significant health risk but that the danger was not *381 definitively known. When Owens-Corning took over the manufacture of Kaylo in 1958, the Saranac file that had been kept by Hazard was sent to Owens-Corning. Hazard, however, did not know if all the Saranac documents and correspondence put into evidence in this trial were actually in the file. In any event, this transfer of material was after Ripa's employment at the shipyard had ceased.
Owens-Corning's products during the 1940's were primarily fiberglass, and, therefore, it had campaigned to impress its asbestos workers with the health benefits of using fiberglass instead of asbestos. At that time, it was in the company's interest to have the workers use fiberglass, but the workers had asked for a premium for working with fiberglass because of an "itch factor." After the company's campaign concerning asbestos' danger, the union dropped the request for premiums to work with fiberglass, apparently also as a result of a study of asbestos conducted by their own doctor. At that point, the Owens-Corning campaign stopped. The president of Owens-Corning, however, received a copy of the literature that would have been sent to the union and which described the hazards of asbestos.
During plaintiff's case in the punitive damages phase of the trial, only two former employees of Owens-Corning testified, both through depositions. The public relations director and assistant to the president of the company from 1940 until 1953, Edward Ames, explained that forty-nine percent of Owens-Corning was owned by Owens-Illinois and that Owens-Illinois' and Owens-Corning's headquarters were physically close, only three blocks apart. He looked to Hazard at Owens-Illinois for advice on the health program since there was no comparable hygienist at Owens-Corning, and he received the scholarly literature on the dangers of asbestos from Hazard. While he knew that asbestos was hazardous, he did not remember knowing that Kaylo contained asbestos.
Owens-Corning, however, relied upon the Threshold Limit Values (TLV's) for airborne particles as established by the American Conference of Governmental Industrial Hygienists. In the post-World *382 War II years, it was thought that there was a weighted average for a concentration of asbestos dust to which a worker could be exposed with impunity over a lifetime. Until 1968, the TLV for asbestos was five million particles per cubic centimeter, and the Kaylo manufacturing facilities showed dust levels below this amount.
Neither Owens-Illinois nor Owens-Corning, however, ever conducted a study of an end-user's facility prior to decedent's last exposure to Kaylo. In 1968, the methodology switched from measuring dust content to counting asbestos fibers, and the industry set a five fiber level in 1968, which was reduced to two fibers in 1972. Some other studies by a physician and a hygienist concluded that insulating was a safe occupation. These studies and the TLV levels in the Kaylo plants convinced Owens-Illinois that it was unnecessary to test the end-user facilities.
The second set of depositions concerning those years was from John Thomas, the president and chief operating officer of Owens-Corning from 1965 to 1970, who had worked in various executive positions from 1939 to 1949 and then was with a textile fiber division until 1959. He knew nothing of the Saranac study and merely testified that Owens-Illinois and Owens-Corning worked together on Kaylo during the 1950's. He had no specific knowledge of Kaylo.
The jury returned a verdict pursuant to detailed interrogatories, which we quote in relevant part:
Which, if any, of the following companies were a substantial contributory cause to Mr. Ripa's asbestos-related injury?
Also indicate the percentage of liability attributable to each company whose product was a substantial contributing cause, taking the total percentage to be 100%, if able to do so based on the evidence.

 Substantial Percentage
 Contributory Cause Responsibility
 Keene Corporation x Yes 10% (unanimous)
 (Ehret Magnesia, Baldwin
 Hill, Baldwin Ehret Hill)
*383
 Owens-Illinois, Inc. x Yes 45% (unanimous)
 (Kaylo Manufacturer)
 Owens-Corning Fiberglass x Yes 45% (unanimous)
 Corporation
 (Kaylo Distributor)
 GAF Corporation x No
 (Ruberoid)
 TOTAL 100% 
 1. Did Peter Ripa have an asbestos-related injury?
 (not including mesothelioma)? x Yes
 (unanimous)
 (If yes, go on to Number 2: If no go on to number 4)
 2. What amount of money, if any, fairly and adequately compensates the
 estate of Peter Ripa for damages caused by his asbestos-related injury?
 (not including mesothelioma). $135,000 
 (unanimous)
 (Go on to Number 3)
 3. What amount of money, if any, fairly and adequately compensates
 Pauline Ripa for her loss of consortium resulting from her husband's
 asbestos-related injury?
 (not including mesothelioma). $150,000 
 (unanimous)
 (Go on to Number 4)
 4. What amount of money fairly and adequately compensates the estate of
 Peter Ripa for the damages caused by his mesothelioma?
 $500,000 
 (unanimous)
 (Go on to Number 5)
 5. Do you find that Peter Ripa's asbestos-related injury, if any, (not
 including mesothelioma) in the end of 1989 and thereafter was a
 substantial contributing factor to his disability?
 x Yes
*384
 (If no go on to Number 6; If yes go on to Number 7)
 6. What amount of money fairly and adequately compensates Pauline Ripa
 for the loss of disability benefits (from September 1992 until April 19,
 1993)?
 $ ____
 (Go on to Number 7)
 7(a) What amount of money fairly and adequately compensates Pauline Ripa
 for her losses resulting from the death of Peter Ripa?
 $325,000 
 (unanimous)
 7(b) What amount of money fairly and adequately compensates Pauline Ripa
 for funeral bills?
 $7120.98 

Defendant raises four principal points concerning the compensatory damages award and six points with several subpoints concerning the punitive damages award.

I
Defendant first claims that plaintiff's settlement with the manufacturer, Owens-Illinois, precludes the continuation of the suit against the distributor Owens-Corning. In making this claim, defendant misreads Promaulayko v. Johns Manville Sales Corp., 116 N.J. 505, 511, 562 A.2d 202 (1989). A manufacturer is liable to indemnify distributors further along the chain of distribution for defects that originate with the manufacturer. Although the manufacturer is primarily liable to a plaintiff, the fact that the manufacturer is liable does not discharge the responsibility of a distributor.
Plaintiff's settlement with Owens-Illinois did not mean that plaintiff has been paid in full. Also, Owens-Illinois did not conclusively buy its peace by such a settlement since under Promaulayko Owens-Corning has a right to be indemnified by Owens-Illinois if Owens-Corning is held liable solely because of its distribution of Owens-Illinois' defective product. In such a case, if plaintiff received from Owens-Illinois and the other settling defendants who are responsible a greater amount in settlement *385 than their percentage of the verdict amount, Owens-Corning will still have to pay its percentage and attempt to obtain reimbursement from the codefendants. Rogers v. Spady, 147 N.J. Super. 274, 278, 371 A.2d 285 (App.Div. 1977).
If, however, Owens-Corning could independently be held liable for a failure to warn or otherwise, then Owens-Corning would merely have a right of contribution from Owens-Illinois. Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 566-567, 410 A.2d 674 (1980). Indeed, the Court in Cartel Capital held that a settlement with a primarily liable manufacturer did not release the distributor/installer "from either its vicarious or direct responsibility." Id. at 561, 410 A.2d 674. Owens-Illinois and Owens-Corning had independent duties as manufacturer and distributor respectively (and as co-manufacturers for a short relevant period) to warn decedent of the dangers of their product. This duty was not the type that was indemnifiable as a matter of law under Promaulayko, where a product with a manufacturing or design defect was merely passed on by a distributor.
The parties need not retry the case to determine whether Owens-Illinois and Owens-Corning were independently liable for breach of their duty to warn. These defendants were equally required to warn, and the jury's verdict was clear that each was forty-five percent liable, not that both were ninety percent responsible. If the latter were so, the jury in effect would have been holding that the product, Kaylo, was ninety percent responsible for the injuries and death and that the manufacturer and distributor were equally responsible for this liability. The jury apportioned responsibility for these defendants' failure to warn decedent of the dangers of the asbestos at the jobsite. Since there was no cross-claim between these related defendants represented by a single attorney at trial, any question of Owens-Illinois being totally liable is moot.

II
Prior to trial, plaintiff stipulated that Keene Corporation, which also shared the other defendants' representation at trial, *386 was forty percent responsible for the liability and would not be responsible for punitive damages. The trial judge held Keene to that stipulation but also enforced the jury's forty-five percent allocations to the other defendants. We find that the judge incorrectly apportioned the judgment based upon this stipulation. The jury determined that Keene was only ten percent responsible and that Owens-Corning and Owens-Illinois were each forty-five percent responsible. By finding Keene forty percent responsible and each of the other defendants forty-five percent responsible, plaintiff, in effect, received 130 percent of his damages. This was incorrect. The judge should have molded this verdict based upon the stipulation and entered a judgment that defendant and Owens-Illinois were each thirty percent responsible since only sixty percent of the responsibility was in issue in this case.
Ordinarily, and unless there was only vicarious responsibility placed on Owens-Corning, it and Owens-Illinois would have had a right to contribution from each other and Keene if they paid more than their allocated shares. Since Owens-Illinois settled for some unspecified dollar amount, its net thirty percent responsibility was satisfied for whatever it paid, and Owens-Corning should have been responsible for only the remaining thirty percent of the judgment.
It is true that if Keene had settled for a specific dollar amount, whatever amount it settled for would satisfy the percentage fixed by the jury. Kiss v. Jacob, 138 N.J. 278, 283-284, 650 A.2d 336 (1994) (quoting from Cartel Capital, supra, and Rogers v. Spady, supra). But a similar result does not occur when a defendant settles for an agreed percentage responsibility. For example, if a plaintiff settles with one or a group of defendants for ten percent, fifty percent or ninety-nine percent liability, the remaining defendants should not potentially bear responsibility for the total liability in the case. This is best demonstrated by reference to a plaintiff who settles with some of the defendants and acknowledges that the settlement constitutes one hundred percent of the liability. Only damages remain to be resolved. *387 Any remaining defendant should have the right to say that the case is totally settled and to ask for a dismissal. Any contrary decision would require that we say that a matter which is one hundred percent settled is still open for judicial resolution. We see no reason to sustain such a fiction. Reasoning backwards, a case that is forty percent settled is only open to sixty percent remaining liability.
Here, there is another strong argument for holding Owens-Corning to only thirty percent: Keene, Owens-Illinois and Owens-Corning were jointly represented at trial. When the attorneys settled forty percent of the case, to be allocated to one of the three clients, it appears clear to us that there was an intention that only sixty percent of the liability remained.

III
Defendant makes good arguments for its next claim, that the total amount of the awards for pain and suffering ($500,000) and wrongful death ($325,000) from the mesothelioma were high. But when the total awards were broken down for the asbestosis, mesothelioma, loss of companionship, and the like, the compensatory awards against Owens-Corning, while high, cannot seriously be challenged. While Ripa was incapacitated by his other medical problems, he was dying a painful death from the mesothelioma. The trial judge sustained the compensatory damage award, and we will defer to the trial judge's "feel of the case." Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993).

IV
Defendant asserts that its expert report from Dr. Demopoulos was mistakenly excluded on a pretrial motion before a different judge, that the trial judge confirmed this decision, and that this constitutes reversible error. While we agree with defendant that the testimony should not have been excluded, the error is clearly harmless under the peculiar circumstances of this case.
*388 During the compensatory phase of the trial, Owens-Corning offered no expert testimony concerning asbestos. It now claims that the trial court improperly excluded the expert testimony of its expert, Dr. Harry Demopoulos. Owens-Corning raises various allegations of error. It claims, and we agree, that an Evid.R. 8 (N.J.R.E. 104(a)) evidentiary hearing should have been held. Defendant should have been permitted to show that the foundation upon which Dr. Demopoulos relied was the type reasonably relied on by experts in the field. In effect, the order entered by the motion judge mistakenly shifted the burden of proof to defendant. As we will explain, however, defendant was not materially prejudiced by these rulings.
By letter of October 13, 1992, Dr. Demopoulos was identified as an expert who was expected to testify for defendant at trial. As a proponent of the "fiber theory" of causation of mesothelioma, Dr. Demopoulos was expected to state that Ripa's mesothelioma was probably caused by exposure to crocidolite,[3] a type of asbestos that allegedly was not present in Kaylo. He noted that the concept of mesothelioma was not accepted by the medical community until 1960. Since decedent developed mesothelioma, and, therefore, according to Dr. Demopoulos had obviously been exposed to crocidolite asbestos, and Kaylo did not contain crocidolite, the mesothelioma could not have been caused by Kaylo. Further, the doctor opined that decedent was exposed to crocidolite at work. In reaching his conclusion that crocidolite was present at *389 the New York Shipyard in Camden, the witness planned to rely on two articles concerning the alleged import of crocidolite into this country and its presence at other shipyards.
Plaintiff moved in limine to preclude Dr. Demopoulos from offering testimony about the presence of crocidolite at Ripa's worksites. On December 18, 1992, the motion judge held a hearing but declined to hear any extended argument on the motion, citing the argument made by the attorneys before him on the identical issue in a companion case. That same day, he entered an order that precluded defense experts from relying on or testifying about the two articles. The order then prevented defense experts from "testifying that ... decedent was exposed to crocidolite asbestos," absent first-hand knowledge or otherwise competent, admissible evidence that crocidolite was present at a worksite of decedent. This order did not, however, preclude Dr. Demopoulos' inferential opinion concerning his theory that decedent's mesothelioma was not caused by exposure to Kaylo.
The admission or exclusion of evidence is generally within the discretion of the trial court, and its ruling will not be disturbed absent a clear abuse of that discretion resulting in an injustice. Dinter v. Sears, Roebuck & Co., 252 N.J. Super. 84, 92, 599 A.2d 528 (App.Div. 1991).
Here, defendant asked for an Evid. 8 (N.J.R.E. 104(a)) hearing, but the motion judge refused and alluded to his experience in another case. The judge stated that
there was a very limited Rule 8 hearing one time when [the motion judge] turned [to] Doctor Demopoulos in a very casual fashion and said "Doctor do you have any personal knowledge of that?" and he very candidly and honestly said no he did not ... And then [that trial] went on, because [the motion judge] didn't want to make a big deal out of it because the jury was sitting right there, and that was the end of it, so that was [the court's] limited Rule 8.
This was an inadequate Evid.R. 8(1) hearing. But the exclusion of evidence must still be examined to see whether it was harmless. R. 2:10-2. The motion judge also had just explained his exclusionary ruling:

*390 Well, I'm not shifting any burden of proof or anything else, I am just specifically saying that your expert cannot rely on these particular articles to make the quantum leap that therefore there had to be this particular fiber at the New York Ship or the  whichever one it was, that's what I'm saying. I'm not saying that you can't use the fiber defense, and I'm not saying that you have to prove, as I was of the opinion initially, that perhaps you have to prove that the fiber was absent from your product, they have to prove that a fiber that was in your product caused the asbestos [sic].
An expert need not have personal knowledge in order to provide an acceptable basis for his opinion. The evidence rules clearly provide that an expert may rely on sources other than personal knowledge, which sources need not even be admissible evidence in the case, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Evid.R. 56(2) (N.J.R.E. 703). Here, the motion judge clearly made no inquiry into whether the articles were "of a type reasonably relied upon by experts," nor apparently had that judge in his earlier case to which he referred at argument.
However, quite apart from the propriety of barring reference to or reliance upon the two articles, the motion judge's insistence that decedent's exposure to crocidolite had to be proven by fact rather than offered as opinion is alleged to have virtually vitiated Owens-Corning's fiber defense. We disagree with Owens-Corning's position. Defendant should not have been required to offer direct proof of the source of crocidolite exposure in order to combat inferentially plaintiff's theory that all types of asbestos cause mesothelioma.
The motion judge understood and explained his ruling as only limiting one small area of proof, not the entire "fiber defense." In a later examination in a companion case, Schiavo v. Keene Corp., Nos. L-07636-88, L-09758-88, L-00878-89 (1993), (the record of which was argued to the trial judge and supplied to us), after being told that defendant considered the fiber defense precluded by his earlier ruling, the motion judge protested that he did not so rule. He stated:

*391 At no time did I ever foreclose the defense from submitting a defense to this matter.... [N]o order has ever said that [the firm] ... may not offer, quote, "the fiber defense."
* * * * * * * *
Dr. Demopoulos may get on the stand in any court in which I'm the presiding judge and testify to that fact [mesothelioma is caused by crocidolite not chrysotile and amosite] and he may relate to any medical literature that he has to support his position.... And being a doctor and an expert, he may rely upon anything which persons practicing his discipline may rely upon in formulating their opinions, including epidemiological studies.
The trial judge accepted the pretrial ruling by the motion judge and understood its limited scope.
[Attorney for Owens-Corning]: The last thing I would bring up, Your Honor, is in this case there was a motion in limine brought before [the motion judge] to preclude certain aspects of the testimony of Dr. Harry Demopoulos with regard to the fiber defense. Specifically it was ordered that Dr. Demopoulos could not testify concerning the fact that there was crocidolite at New York Ship and or Philadelphia Naval Yard in reliance upon literature, he had to have personal knowledge. We did take an interlocutory appeal which was not heard. I would request that his [ruling] be reconsidered by the trial judge at this time.
* * * * * * * *
[THE COURT]: Well, we have the right to do it. I mean insofar as it's concerned. I have the right to make a different determination, but candidly I'm not going to make a different determination unless there's some additional facts to be argued. Is there anything in addition to what you argued before the [motion judge]?
[Emphasis added.]
Owens-Corning's fiber defense was built on what was essentially a syllogism: (1) An injured plaintiff's mesothelioma can only be caused by crocidolite; (2) defendant's product contains no crocidolite; therefore, (3) plaintiff contracted his or her mesothelioma by exposure to some other product, one containing crocidolite; and (4) since crocidolite was present in other products at decedent's worksite, the opinion concerning causation is borne out by the circumstances of the case. Remove either of the first two parts, and the syllogism fails. But if the fourth element is removed, all that is missing is some corroboration.
If the judge had prohibited testimony about decedent's putative exposure to crocidolite because that testimony was opinion based on deductive reasoning and not on first-hand knowledge, the court *392 would have materially impinged on the role of the expert witness, which is to assist the trier of fact in areas "beyond the ken of the average juror." State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984). Even the fourth element was admissible as expert opinion, and was mistakenly excluded. The issue was not, as stated by the motion judge, one of hearsay because of the witness' incorporation of the two disputed studies as a basis of his opinion.[4] The function of the trial court is to determine the admissibility of evidence, but not to pass on its eventual credibility or weight. Lanzet v. Greenberg, 126 N.J. 168, 186, 594 A.2d 1309 (1991). The admissibility of the articles was not the issue; Dr. Demopoulos's opinions were.
This conflict points out the problem with the motion judge's order, and the trial judge's concurrence. The objection to Dr. Demopoulos' testimony should not have been raised as a hearsay issue unless defendant attempted to prove the truth of the articles or statements made by other experts to the witness. The articles and statements were not the proposed evidence; the opinions of the witness were. The witness stated, as he did in the extensive voir dire in another companion case (argued to the trial judge) where the opinion evidence was permitted (Sheeks v. Keene Corp., L-7453-91 (1992)), that the basis of his opinion was the type of data upon which experts in his field rely.[5] This would have *393 satisfied Evid.R. 56(2) (N.J.R.E. 703), unless Evid.R. 4 (N.J.R.E. 403) barred the use of the opinion evidence, or the scientific reliability was challenged under the standards of Landrigan v. Celotex Corp., 127 N.J. 404, 414-418, 605 A.2d 1079 (1991). Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, ___-___, 113 S.Ct. 2786, 2794-2795, 125 L.Ed.2d 469, 480, 481 (1993).
Although only the final element of defendant's proof was precluded, defendant chose not to present any part of Dr. Demopoulos' reasoning. The jury, at defendant's choice, was not given the theory that mesothelioma was only caused by crocidolite, a substance not found in Kaylo. This testimony was not barred and would have provided the foundation for the mistakenly barred testimony. But in determining the effect of the errors, we must try to look only at the barred opinion testimony as it might have affected the trial. If defendant did not think that the permitted testimony was of sufficient import to present,[6] why should the preclusion of only the final non-dependent argument be other than harmless error? We are not inclined to upset the entire compensatory verdict over a preclusion of an embellishment where the basic argument was voluntarily withheld by defendant.
*394 We therefore conclude the pretrial limitation of Dr. Demopoulos' testimony was but harmless error. We find no basis to upset the liability verdict or compensatory damages awarded.

V
Defendant's objections to the punitive damage award have been divided into six sections. It claims that (1) the award violates New Jersey law; (2) it violates the United States and New Jersey Constitutions; (3) it was unsupported by evidence proving actual malice or wanton and willful disregard of the rights of others; (4) the award was grossly excessive; (5) it was affected by unduly prejudicial and irrelevant evidence; and, finally, (6) it was considered by the jury under an improper standard of proof. We treat these issues generally.
As noted earlier, we have already determined that the liability and compensatory damage verdicts need not be remanded for redetermination. Punitive damages in particular are dependent upon a jury's determination of liability. Where punitive damages are concerned, the nature of defendant's conduct and the probability that defendant's conduct caused the injuries are prime considerations. Since this matter is to be remanded for a retrial only on punitive damages, we recognize that, of necessity, there must be some recapitulation for the jury of the basis for both the compensatory and punitive damage awards. We will, therefore, briefly analyze defendant's claims as a guide to the trial judge when the matter is reconsidered.

a.
Under the standards of Fischer v. Johns-Manville Corp., supra, 103 N.J. at 656, 512 A.2d 466, the jury certainly could have found that Owens-Corning should have realized there was a high risk of injury if it (1) studied the initial Saranac results, and (2) applied even the now-discredited TLV's to the end users of the Kaylo product. Although defendant's own manufacturing plant may have passed the TLV test of the 1950's, defendant apparently gave *395 no warnings to the end users who might be using the Kaylo in the narrow confines of ship passageways or boiler rooms with poor ventilation. While defendant was not shown to have actively suppressed its knowledge of Kaylo's potential dangers, it also gave no notice of the danger to the end users or their employers. The absence of complaints was not significant since it apparently was known that cancers caused by asbestos did not appear for many years.
The claim against Owens-Corning relates to decedent's mesothelioma which caused his death, not to the asbestosis from which decedent suffered or even to any possible danger from other asbestos-related cancers. Defendant could, therefore, only be punished for that which was the narrow substance of plaintiff's claims. Plaintiff's theory of liability was accepted by the jury, that the inhalation of any of the various forms of asbestos could be found to have caused this cancer. If defendant's fiber theory had been accepted, then the jury could have awarded such damages only if it found that Kaylo contained crocidolite fibers.
Fischer considered and rejected each of the arguments raised by defendant. These included (a) the remoteness of the conduct from the award; (b) the changed corporate structure and personnel from the decision makers at the time of the injury to those who must suffer the punitive damage consequences; (c) the change in stockholders during the same period so that the award falls on those who had reaped no benefit, permitting those who had performed the punishable conduct to have sold for full value; and (d) the lack of deterrent value of the award when it is imposed upon a corporation which may no longer even be producing the offending product. 103 N.J. at 660-665, 512 A.2d 466. It is not for this court to readdress these arguments, however appealing some of them may be. We, therefore, merely reiterate the Supreme Court's explanation in Fischer that a manufacturer, aware of the dangerous features of its product but which nevertheless markets the product, has the ability to factor into the price the cost of compensatory damages and to procure sufficient liability *396 insurance. The negligent manufacturer which produces the same product without anticipating the dangerous propensities may not be similarly protected. Without punitive damages, the former would fare at least as well, if not better, than the latter. The latter, however, would not be subject to punitive damages which serve as the only deterrent to manufacturers who would purposefully market dangerous products with insufficient warnings. See 103 N.J. at 664-665, 512 A.2d 466.

b.
The United States Supreme Court in TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. ___, ___, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366, 379-380 (1993) and Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1, 20 (1991) sustained the application of punitive damages in civil cases as constitutional, provided that there is appellate review of the reasonableness of punitive damage awards. See also Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 338, 627 A.2d 1081 (1993).
The claim, now made by defendant, that multiple punitive damage awards violate defendant's due process rights and are thus unconstitutional under Pacific Mut. Life Ins. Co. v. Haslip, supra, was not expressly raised in the earlier Fischer case, although the argument was certainly implicit. While there are no published opinions in New Jersey addressing the issue, it has been raised in courts around the country. No appellate court has found that repetitive punitive damage awards against asbestos defendants for the same course of conduct violate due process. See, e.g., Keene Corp. v. Kirk, 870 S.W.2d 573, 581 (Tex. App. 1993), (where codefendant Keene conceded the absence of a due process violation). This includes a divided Third Circuit. See Dunn v. Hovic, 1 F.3d 1371, 1385-1391 (3d. Cir.), cert. denied sub nom., Owens-Corning Fiberglas Corp. v. Dunn, ___ U.S. ___, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993).
*397 The oft-quoted standard for reviewing punitive damage awards in light of due process claims was stated in Haslip, supra, where the Supreme Court accepted the Alabama Supreme Court's criteria for determining the reasonableness of punitive damage awards as stated in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-224 (Ala. 1989) and Central Alabama Electric Coop. v. Tapley, 546 So.2d 371, 376-377 (Ala. 1989). The Supreme Court adopted the following criteria:
(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.
[499 U.S. at 21-22; 111 S.Ct. at 1045; 113 L.Ed.2d at 22.]
Here, defendant does not challenge the jury instructions, nor would such an attack be fruitful in light of the standards articulated in such cases as Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 477 A.2d 1224 (1984).
In both Herman and Fischer our Supreme Court did not review the quantum of damages. See Herman, supra, 133 N.J. at 346, 627 A.2d 1081; Fischer, supra, 103 N.J. at 672, 512 A.2d 466. As is noted in Fischer, there are better alternatives than case-by-case awards of punitive damages, yet a state court's hands may be tied. Class actions to resolve nationwide problems are better suited to the federal courts. 103 N.J. at 666-669, 512 A.2d 466.[7]
The treatment of punitive damages in what truly is a mass tort is anomalous. As defendant notes, tens of thousands of asbestos *398 claims are proceeding in the federal courts on a consolidated basis, and many have been remanded for trial with their punitive damage claims severed. The alternative would be for individual juries to return repetitive awards for punitive damages, each seeking to punish each defendant for its entire course of conduct or even for one small element of it. The defendant may choose to present to the jury the history of awards already made and the potential of awards to be made in the other pending cases, but this could be potentially devastating. In Fischer, the Court left the decision to each defendant; some may choose to educate the jury concerning past awards and pending claims, others may not. 103 N.J. at 670, 512 A.2d 466. But even this decision by a defendant yields questionable results. Punitive damages in individual cases which are part of mass tort claims and not incorporated in class actions or other coordinated actions have the attributes of a national lottery. For essentially the same conduct, defendants are punished in some cases, as here, with millions of dollars in punitive damages; in other cases the awards are in the hundreds of thousands of dollars; and in still others no punitive damages at all are returned. In all of the cases, we must posit that the plaintiffs have been fully compensated by the compensatory awards. Yet the survivors in some cases are made instant millionaires; in others they merely receive amounts sufficient to pay their attorneys and trial expenses or nothing at all.[8] Potential legislative *399 solutions abound, including pending legislation in the Congress and State Legislature that would establish caps on punitive damages awards, yet the lottery wheel still turns.

c.
Our Legislature has spoken on the subject of punitive damages in the 1987 Products Liability Act, N.J.S.A. 2A:58C-1 et seq. The Act does not by its terms apply to environmental torts, N.J.S.A. 2A:58C-6, and the definition of an environmental tort action under N.J.S.A. 2A:58C-1(b)(4) includes a toxic tort such as the one before us. But the punitive damage procedures contained in the Act are to govern "all claims for punitive damages, even those that arise outside the act." Herman v. Sunshine Chem. Specialties, Inc., supra, 133 N.J. at 346, 627 A.2d 1081; Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J. Super. 200, 227 n. 23, 543 A.2d 1020 (App.Div. 1988), aff'd o.b., 118 N.J. 249, 571 A.2d 294 (1990).
In Herman, the Supreme Court interpreted N.J.S.A. 2A:58C-5d(4) to require a jury to "consider evidence of a defendant's financial condition in determining the amount of punitive damages." 133 N.J. at 341-342, 627 A.2d 1081. The punitive damage phase of the trial is bifurcated but is held before the same jury as determined compensatory damages. The jury makes separate determinations of entitlement to punitive damages and the quantum of damages. Id. at 343, 627 A.2d 1081. In each case, the *400 statute provides that "the trier of fact shall consider all relevant evidence, including, but not limited to," the appropriate factors listed in the statute. See N.J.S.A. 2A:58C-5b and -5d. We note that the statutory factors are non-inclusive and were not meant to supersede the longer list of relevant factors found in Fischer v. Johns-Manville Corp., 103 N.J. at 673, 512 A.2d 466. See also the Appellate Division decision in Fischer v. Johns-Manville Corp., 193 N.J. Super. 113, 129 n. 3, 472 A.2d 577 (App.Div. 1984). The Court in Herman determined that the statutory language that the trier of fact "shall" consider the factors specifically mentioned in the statute was mandatory. 133 N.J. at 341-342, 627 A.2d 1081. Therefore "the financial condition of the tortfeasor" must be shown to the jury. Ibid.
We further note that in Herman the Court did not merely make the product liability statute's bifurcated procedure applicable to all punitive damage claims. It stated this principle in the following context:
Although the present case arises in the context of a claim for punitive damages in a products-liability action, the requirements for bifurcation of compensatory and punitive damages, for allocation to a plaintiff of the burden of proving a defendant's financial condition, for proof of a prima facie case as a condition precedent to discovery of a defendant's financial condition, and for limitations on such discovery apply as readily to all such claims. Consequently, we expect those requirements to govern all claims for punitive damages, even those that arise outside the act.
[133 N.J. at 346, 627 A.2d 1081.]
If the discovery and proof of the "defendant's financial condition" includes concluded and pending punitive damage claims, plaintiffs may be less likely to assert that the particular jury should punish for all plaintiffs wherever located. Defendants will be unable to hide from awards made elsewhere.[9]
*401 Counsel for defendant has represented that in numerous other Kaylo cases, where permitted by local law, juries have been requested to punish defendant for its alleged entire course of conduct, resulting in multiple awards. Defendant represents that as of November 30, 1993 there have been thirty punitive verdicts totaling more than $57,000,000 after remittiturs and appeals. Some of these awards are on appeal, and only a small percentage of them has actually been paid.
Sufficient financial information concerning defendant had been presented to the jury to show that it had over a billion dollars in assets and annual sales of 2.87 billion dollars. As disclosed in a post-trial motion, the aggregate of the punitive damage awards against defendant, whether $35,000,000 as alleged in the trial of this case or $55,000,000 as alleged in a companion case we are to hear, or the $57,000,000 alleged in defendant's brief, is still but a few percent of defendant's net assets. If they continue, the aggregate awards could wipe out a defendant, but Owens-Corning is in no such danger at this time. Yet at some point the punitive damages must be said to have had their adequate punitive effect. We have merely raised questions to be answered elsewhere with a view to provide order to an irrational system.

d.
If an award of punitive damages is to be sustained, we must, as noted earlier, make an independent review of the quantum of damages. A novel issue is presented to us. Should our review be based upon the evidence at trial, or may it be supplemented by proofs of post-trial information concerning defendant's financial condition based upon additional final punitive damage awards entered against defendant? This issue was presented by motion which we reserved until our opinion in this case. We will now resolve that issue.
*402 It seems apparent to us that insofar as we are reviewing any ruling of the trial judge, we would not consider any post-trial data received by us. However, insofar as we must make an independent analysis of the punitive damage awards as required by TXO Prod. Corp. v. Alliance Resources Corp., supra, and Pacific Mut. Life Ins. Co. v. Haslip, supra, and by Herman v. Sunshine Chem. Specialties, Inc., supra, we should consider the later information. We have reviewed the prior punitive damage claims or judgments in other actions in order to appraise defendant's arguments; we did not, however, accept such data as substantive evidence. At this stage in the proceedings, we accept the figures for a limited purpose. They are offered to us as part of an extensive affidavit by Robert A. McOmber dated March 24, 1993, former litigation counsel to Owens-Corning in its Toledo, Ohio law department. This material, not having been presented to the jury, is not part of the record before us. We have considered it only insofar as we have the independent duty to review a punitive damage award and in order to give guidance to the trial court concerning how the materials might be utilized if they are offered at a retrial. We recognize that other courts have rejected such data. See Kochan v. Owens-Corning Fiberglass Corp., 242 Ill. App.3d 381, 182 Ill. Dec. 814, 825-826, 610 N.E.2d 683, 694-695, app. den., 152 Ill.2d 561, 190 Ill.Dec. 891, 622 N.E.2d 1208 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).
One might argue that all pre-verdict data concerning punitive awards, even those which had not been presented to the jury, should be revealed to the appellate court. As noted earlier in the opinion, however, we read Fischer as leaving to defendant the option of introducing this data before the jury, and we merely review the present trial record that does not contain such data. The plaintiff is able to discover this data and to present it, as it must present all other data concerning the defendant's financial condition. See Herman v. Sunshine Chem. Specialties, Inc., supra, 133 N.J. at 343, 627 A.2d 1081.

*403 e.

Defendant suggests that the courts should adopt a "clear and convincing evidence" standard of proof concerning punitive damages. While this is the standard contained in most of the federal acts under consideration, the issue was considered but rejected in drafting the 1987 New Jersey Products Liability Act in which the "preponderance of the evidence" standard was retained. See N.J.S.A. 2A:58C-5a. It is true that in Fischer v. Johns-Manville Corp., supra, the Supreme Court specifically left open the possibility of employing the more restrictive "clear and convincing" evidence standard in punitive damage cases. 103 N.J. at 673-674, 512 A.2d 466; see also Id. at 682, 512 A.2d 466 (O'Hern, J. dissenting). But the decision in Herman to adopt the Products Liability Act's procedure in all future punitive damage cases settles this issue for the time being.

f.
One of the bases of plaintiff's claim of punitive damages was that Owens-Corning knew of the Saranac studies and their results. Although defendant acknowledges receipt of the interim (1952) and final (1956) reports, there is no definitive proof that defendant received all of the Saranac documents.[10] These documents included the following:
(1) A February 12, 1943 letter from U.E. Bowes (an Owens-Illinois employee) to Dr. Gardner at Saranac asking him to initiate the study of the product that eventually would be called Kaylo. The study was to include the effects on end users.
(2) A letter of February 23, 1943 from Gardner to Bowes acknowledging the request and asking preliminary questions.
*404 (3) A March 12, 1943 letter from Gardner to Bowes suggesting that the materials "have all the ingredients for a first class hazard."
(4) A May 31, 1944 letter from Gardner to Bowes stating that the asbestos dust was "potentially dangerous" if smaller than the particles sampled.
(5) An October 30, 1947 interim project report claiming that there was no evidence that Kaylo caused either pulmonary or respiratory problems.
(6) A November 16, 1948 letter from Dr. Vorwald of Saranac to Bowes identifying "unmistakable evidence of asbestosis" in all remaining test animals. Vorwald also stated that it was better to discover the potential for asbestosis in animals than in industrial workers and noted that Owens-Illinois has been forewarned.
(7) A letter of February 7, 1952 from Dr. Vorwald to Hazard (the industrial hygienist at Owens-Illinois) suggesting that "every precaution" should be taken against inhalation of Kaylo dust.
(8) A June 1, 1950 letter from Dr. Vorwald to Hazard suggesting that Kaylo produced an asbestosis-like reaction in the lungs and that "every precaution should be taken to minimize exposure of industrial employees."
(9) The final confidential January 1952 project report concluding that Kaylo dust when inhaled for a long period of time produced peribronchiolar fibrosis typical of asbestosis in guinea pigs but not rats, but not implicating Kaylo as a carcinogen.
Hazard testified that he did not remember talking about the Saranac information with Owens-Corning because "the reports went over so that there was no further need to discuss it." He also testified that he had sent "material" relating to the Saranac study to Owens-Corning, but that he could not definitively state that all of the correspondence introduced at trial had been in the file. Much of this data was given to Owens-Corning after decedent's employment terminated in 1957.
*405 There is no question that during this period Owens-Corning and Owens-Illinois were closely connected. We have already described the stock ownership and mutual directors. The president of Owens-Corning had been executive vice president at Owens-Illinois. While at some later time the interlocking boards were disbanded to comply with governmental regulations, in the 1940's and 1950's there was a definite close relationship. But there was an insufficient showing of notice of the many Saranac documents which the jury was led to believe were known to Owens-Corning which still marketed Kaylo with no warnings to the end users.
As a general rule, when an officer or agent of one corporation with particular knowledge later acts on behalf of another corporation, his personal knowledge is not imputed to the second entity. See Owens-Illinois, Inc. v. United Ins. Co., 264 N.J. Super. 460, 517, 625 A.2d 1 (App.Div. 1993), rev'd o.g., 138 N.J. 437, 650 A.2d 974 (1994). While there is an acknowledged exception to this rule where both business entities are close corporations, ibid., we cannot say that the exception should apply to corporations of the size and complexity here involved. The trial court nevertheless found a commonality of interest and that this interest and the corporations' interlocking boards were valid considerations to impute the knowledge of the content of the Saranac documents to Owens-Corning.
Even if there were such commonality of interest, Owens-Corning did not begin to sell Kaylo for Owens-Illinois until 1953. By then the Saranac study was concluded except for the publication of the final report. But there is no proof that we can see in this record that Owens-Corning even knew of the existence of the project until the late 1950's. Given the incriminating nature of the Saranac documents showing potential adverse effects on the end users of Kaylo, the admission of the Saranac documents against Owens-Corning, without a better foundation, had the capacity to inflate the punitive damage verdict significantly. Had there been only a minimum punitive damage award returned, we might have found that there was no showing that the admission of these *406 documents had inflamed the jury. But here there was a $5.5 million award, and we cannot say that the error was harmless.[11]
Even if the jury might have been able to infer from the presence of other material, such as the preliminary and final reports, that the entire Saranac file had been given to Owens-Corning during the relevant time period, the judge was required to give an appropriate charge concerning how the jury should accept conditionally-admitted evidence. Under Evid. R. 8(2) (N.J.R.E. 104(b)), the rule is clear:
(2) Where evidence is otherwise admissible if relevant and its relevance is subject to a condition, the judge shall admit it if there is sufficient evidence to support a finding of the condition. In such cases the judge shall instruct the jury to consider the issue of the fulfillment of the condition and to disregard the evidence if they find that the condition was not fulfilled. The judge shall instruct the jury to disregard the evidence if he subsequently determines that a jury could not reasonably find that the condition was fulfilled.
[Evid. R. 8(2).]
(b) Relevance conditioned on fact. Where evidence is otherwise admissible if relevant and its relevance is subject to a condition, the judge shall admit it upon or subject to the introduction of sufficient evidence to support a finding of the condition. In such cases the judge shall instruct the jury to consider the issue of the fulfillment of the condition and to disregard the evidence if it finds that the condition was not fulfilled. The jury shall be instructed to disregard the evidence if the judge subsequently determines that a jury could not reasonably find that the condition was fulfilled.
[N.J.R.E. 104(b).]
Both the old and new rules provide that the jury "shall" be instructed that it must find the condition (here the timely delivery of the material to Owens-Corning) satisfied before the conditionally admitted evidence may be considered. No such charge was given. Therefore, even if the Saranac documents were conditionally *407 admissible, the jury was given no guidance how they should be considered.

g.
One other evidence point is deserving of note. The testimony of John Thomas was admitted, and defendant contends that the substance of the testimony was speculation. Thomas was the Owens-Corning employee who had moved from Owens-Illinois when the younger company was formed in 1938. During the 1940's he moved from the research department to be assistant to the president, but from 1949 to 1959 he served in a division of Owens-Corning which was developing a new textile fiber. From 1965 to 1970 he was president and chief operating officer of Owens-Corning. Thomas testified that throughout the 1940's and 1950's he was of the opinion that care had to be used with asbestos because it created dust and could cause illness. He knew of a risk of asbestosis but not of cancer. During this period, however, he did not actually work with asbestos and knew nothing of Kaylo. He testified that "in all honesty I think we should have been suspicious of [asbestos containing pipe covering] by [the 1950's]." He agreed that the letter accompanying the final Saranac report would have raised a "red flag." He was asked a single hypothetical question. He answered that if he had been president in 1952 and received the Saranac report, the results "would have probably been what I expected if I knew the tests were being made." Although other hypotheticals were asked, they all related to his personal knowledge and not what he would have done had he been president.
Defendant also contends that Thomas was incompetent at the time of trial. The judge's determination to the contrary was based upon his judgment after reading the deposition. We have no cause to override this decision. Evid.R. 17 (N.J.R.E. 601).
The other problems relating to Thomas' testimony concern challenges involving his opinion of warnings. The thrust of these questions related to a period after decedent's exposure and also *408 clearly reflected Thomas' personal views which the trial court believed was relevant for the 1940's and 1950's as well as the 1960's. The admission of this testimony was at best questionable, but if there had not been the error in the admission of the Saranac documents, we would have found the Thomas testimony to be harmless error. R. 2:10-2.

VI
To recapitulate, we determine that the admission of the Saranac documents without either a proper foundation or a proper jury charge was error that had a potentially harmful effect on the quantum of punitive damages. The issue of the documentation contained within the "financial condition" of a defendant needs further definition by the Supreme Court or the Legislature, and we are bound by the prior definitions in Fischer v. Johns-Manville Corp., supra and Herman v. Sunshine Chem. Specialties, Inc., supra until this issue is resolved. The compensatory damages against Owens-Corning should have been limited to thirty percent of the total compensatory award for the mesothelioma.
Reversed and remanded for a new trial on the issue of punitive damages. The compensatory damages shall be recomputed to reflect a thirty percent responsibility against Owens-Corning. The judgment is otherwise affirmed.
NOTES
[1] A succinct explanation of the difference among asbestosis, asbestos lung cancer and mesothelioma was stated by the Supreme Court in Fischer v. Johns-Manville Corp., 103 N.J. 643, 660-661 n. 2, 512 A.2d 466 (1986):

Asbestosis is a progressive and incurable disease in which a scarring process initiated by the inhalation of asbestos fibers destroys air sacs in healthy lung tissue, causing a decrease in pulmonary function and lung volume. Lung cancer caused by asbestos occurs in the lower lobes of the lungs and is, like asbestosis, incurable. Mesothelioma, another of the most common asbestos-related disabilities, is a malignant tumor of the membrane lining the lungs and the chest and abdominal cavities. It is also a latent disease, and is invariably fatal.
See also the various explanations of the physiology of mesothelioma in Becker v. Baron Bros., 138 N.J. 145, 154-156, 649 A.2d 613 (1994).
[2] Owens-Illinois Company, also known as Owens-Illinois Glass Company, will be referred to herein as Owens-Illinois. Owens-Illinois was then a forty-nine percent owner of Owens-Corning. Corning Glass owned another forty-nine percent of the stock, and each elected one member less than one-half of Owens-Corning's Board of Directors. There were some mutual Directors.
[3] Dr. Demopoulos opined that crocidolite asbestos and the contaminant tremolite were the sole types of asbestos that could cause mesothelioma. The more common amosite and chrysotile asbestos had a fiber structure that precluded them from being a cause of mesothelioma, although they are recognized as causing the debilitating asbestosis from which decedent also suffered. (This testimony was at some variance with proofs in other cases. See Becker v. Baron Bros., supra, 138 N.J. at 154-156, 649 A.2d 613, attributing most mesothelioma to chrysotile contaminants such as tremolite and actinolite, id. at 155, 649 A.2d 613, or from amphibole asbestos consisting of amosite and crocidolite. Id. at 154, 649 A.2d 613.) The prevalent theory, however, adopted by plaintiff's expert, is that all three principal types of asbestos (amosite, chrysotile and crocidolite) can cause mesothelioma.
[4] At an earlier voir dire testimony in other matters, on which the motion judge relied in part, Dr. Demopoulos stated that there were in fact three bases of his opinion, and each buttressed the others: The articles, testimony he had heard or read from other researchers in the field, and the witness' background experience as a pathologist including discussions with other pathologists and discussion at scientific meetings.

The motion judge precluded the testimony even after acknowledging that identical opinion testimony in other matters had been permitted by one or more other judges in the county.
[5] Defendants in the earlier cases had even submitted an alternative theory of how the workers in those cases had contracted the mesothelioma. Dr. Demopoulos opined that crocidolite asbestos had been used in the filters of certain cigarettes during the 1950's and possibly had been ingested through smoking. A defendant, however, is not required to supply such proofs, except as it wishes to bolster its claim that its own product was free from the offending asbestos.
[6] We recognize that the "fiber defense" is subject to serious controversy and might have been rejected by a jury after all proofs were heard. We also recognize that the defense may not have been presented, not because of any preclusive ruling, but because defendant may have been fearful of further rebuttal of the foundations of the defense, namely, that only crocidolite causes mesothelioma or that Kaylo did not contain crocidolite.

In our recent review of another companion case, Meyermann v. Eagle Picher Indus., No. A-2176-93 (App.Div. April 1995), we have reviewed later evidence that Kaylo may in fact have contained small amounts of crocidolite from time to time. We had in the case before us asked for supplemental briefs concerning whether to take notice here of such evidence from defendant's personnel after the expressions to the contrary in this case. We conclude that there should be no such use, since the issue was not presented to the trial judge.
[7] But see Complex Litigations: Statutory Recommendations and Analysis §§ 4.01 and 4.02, pp. 177-216 (ALI 1994) (1993 recommendations for consolidation of actions in state courts through state-to-state and federal-to-state transfer of cases).
[8] This result itself is highly questionable. Fully-compensated plaintiffs reap the benefit of a defendant's punishment, while other tort victims may be uncompensated. At the same time funds for product safety are legislatively reduced for lack of funds. Should not the proceeds of these awards, after reasonable compensation to the victim and attorney who have generated them, be employed for the general benefit of the larger society that the defendant has harmed? For example, a sizable share of any punitive damage award in a product liability case could be contributed to a state or federal fund to advance product safety. See e.g., H.R. 1234, 104th Cong., 1st Sess. § 4004(d)(1) and (2) (1995); H.R. 352, 104th Cong., 1st Sess. § 104(b)(1) and (2) (1995); H.R. 5228, 103d Cong., 2nd Sess. § 6204(d)(1) (1994); S. 7, 104th Cong., 1st Sess. § 4305(a) and (b) (1995) (all pending congressional bills providing for the public use of a portion of medical malpractice punitive damages awards). See also N.J.S.A. 46:30B-74 (establishment of Unclaimed County Deposits Trust Fund and the Unclaimed Personal Property Trust Fund). We commend the problem to the Legislature for imposition of a more rational solution than dissipating the defendant's corporate assets for the private enrichment of random fully-compensated victims. See the cogent dissent of Judge Weis in Dunn v. Hovic, supra, 1 F.3d at 1396-1405. While it appears that there should be a single coordinated punishment for the willful or wanton injury, if proven, of so many victims, we continue to run the risk that repeated jury verdicts will wipe out or so damage the defendant that later claimants may not even be able to obtain their compensatory awards. We also impose such damages upon firms that had corrected the problem a generation ago and whose management may now be leaders in the area of product safety.
[9] There is consequently a cogent argument that a defendant's "financial condition" should include information concerning all judgments rendered against it for punitive damages and all pending claims for punitive damages. This issue, however, has not been specifically raised before us and, as noted earlier, Fischer leaves this decision to each defendant. Herman, as also noted earlier, requires that plaintiff present the defendant's financial condition to the jury. We, therefore, must leave to the Supreme Court or Legislature the decision whether such information must be presented to a jury and which party must present the information.
[10] Even if they were received in 1958 when Owens-Corning took over the manufacture of Kaylo, this was after Ripa's exposure had ceased.
[11] The issue of the admission of the Saranac documents has received disparate treatment in other cases. Compare In re Southern & Eastern Dist. Asbestos Litigation, 730 F. Supp. 582, 588 (S.D.N.Y. 1990) (ruling on in limine basis that there was insufficient evidence to support a finding that the Saranac documents had been received by Owens-Corning) with Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 413 S.E.2d 630, 635 (1992) (on law of the case, admitting the Saranac documents was not error).