661 A.2d 814

BARBARA JADLOWSKI, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF DONALD P. JADLOWSKI, PLAINTIFF–RESPONDENT, CROSS–APPELLANT, v. OWENS–CORNING FIBERGLAS CORPORATION, DEFENDANT–APPELLANT, CROSS–RESPONDENT, AND A.C. & S., INC., FORMERLY ARMSTRONG CONTRACTING AND SUPPLY, INC., THE ANCHOR PACKING COMPANY; A.P. GREEN INDUSTRIES, INC.; ARMSTRONG WORLD INDUSTRIES, INC.; THE BABCOCK & WILCOX COMPANY, BURNS & ROE ENTERPRISES INC.; CENTRAL JERSEY SUPPLY CO.; COMBUSTION ENGINEERING, INC.; CONDENSOR SPECIALTIES AND REPAIRS, INC.; CROWN, CORK & SEAL CO., INC.; DIAMOND POWER SPECIALTY CO., INC.; EAGLE–PICHER INDUSTRIES, INC.; E & B MILL SUPPLY CO.; ELIZABETH INDUSTRIAL HARDWARE; FIBREBOARD CORP.; FLEXITALLIC INC.; THE FLINTKOTE CO.; GAF CORP.; GARLOCK, INC.; H.K. PORTER CO., INC.; INDUSTRIAL WELDING SUPPLY, INC.; KEENE CORP.; MADSEN & HOWELL, INC.; METROPOLITAN REFRACTORIES CORP.; NATIONAL GYPSUM CO.; OWENS–ILLINOIS, INC.; PITTSBURGH CORNING CORP.; PORTER–HAYDEN CO.; QUIGLEY CO., INC.; RARITAN SUPPLY CO.; ROBERT A. KEASBEY CO. SOUTHERN TEXTILE CORP.; STANDARD INSULATION CO.; STATE INSULATION CORP.; UNITED CONVEYOR CORP.; UNITED STATES GYPSUM CO.; WORTHINGTON CORP.; YORK INDUSTRIES CORP.; FOSTER WHEELER CORP.; JANOS INDUSTRIAL INSULATION, INC.; M.H. DETRICK CO.; RESEARCH COTTRELL, INC.; JOHN DOE 1 THROUGH JOHN DOE 75 (FICTITIOUS), JERSEY CENTRAL POWER & LIGHT CO., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued June 5, 1995—Post–Argument Memoranda
Filed June 23, 1995—Decided July 21, 1995.

200

Before Judges DREIER, VILLANUEVA and WEFING.

*Larry Simms, pro hac vice,* argued the cause for appellant-cross respondent (*Tucker, Biegel & Goldstein,* attorneys; *Andrew Constantine II,* on the brief).

*Christopher M. Placitella* argued the cause for respondent-cross appellant (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Placitella, Lynne M. Kizis* and *Jean M. Shanley,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendant Owens–Corning Fiberglas Corporation appeals from a Law Division judgment entered in favor of plaintiff, Barbara Jadlowski, in her individual capacity and as executrix of the estate of her late husband, Donald P. Jadlowski. Although the notice of appeal stated that it was taken from the entire judgment, defendant Owens–Corning directs its arguments solely to issues affecting the punitive damages judgment originally returned by the jury in the amount of $15,000,000 but remitted to $2,500,000 by the trial judge on defendant's motion. Plaintiff cross-appeals from the remittitur. We are constrained to reverse the award and remand for a new trial on punitive damages.

The parties in this case raise many of the same issues as were addressed by this court in *Ripa v. Owens–Corning Fiberglas Corporation,* 282 *N.J.Super.* 373, 660 *A.*2d 521 (App.Div.1995) and *Schiavo v. Owens–Corning Fiberglas Corporation,* 282 *N.J.Super.* 362, 660 *A.*2d 515 (App.Div.1995). The principal difference between this case and the *Ripa* and *Schiavo* cases is that the time frame of this case is later than that treated in the other opinions, thus implicating Owens–Corning's knowledge and actions in the 1960's and 1970's and related issues.

Plaintiff and her late husband, then fifty-four years old, brought this action against a dozen manufacturers of or users of asbestos or asbestos-containing products. Decedent was exposed to asbestos for eleven years from the late 1950's through the early 1970's in various employments in Greenland, Cuba, the Brooklyn Navy Yard and, finally, with Jersey Central Power & Light Company.

He described numerous manufacturers of the asbestos products with which he worked and specifically identified Kaylo, manufactured by Owens–Corning, as a product to which he had been exposed. Unlike the situation in *Ripa* or *Schiavo,* defendant was not singled out as a principal supplier of the asbestos to which decedent was exposed.

In 1990, decedent was diagnosed as suffering from pleural effusions. Three months later he was diagnosed as having meso-

thelioma from which he died on April 17, 1992, leaving plaintiff as his widow after thirty-two years of marriage. The jury heard and saw his testimony through a *de bene esse* videotaped deposition. It determined that decedent suffered and died from asbestos-related mesothelioma and that Owens–Corning's product was a substantial contributing factor in causing this mesothelioma. Owens–Corning, however, had discharged its duty to prove that decedent had been exposed to the products of many other defendants, and thus Owens–Corning was found to be only eleven percent responsible.[1]

The total compensatory damages were less than $800,000. The jury awarded $200,000 for decedent's lifetime pain and suffering and $30,000 to plaintiff for her *per quod* claim. In addition, the jury awarded $43,400 for lost wages; $382,000 for wrongful death damages; $144,407.43 for medical bills, and $4,995 for funeral expenses. After the judge molded the verdict to reflect Owens–Corning's eleven percent responsibility, the total compensatory damage award against Owens–Corning was $72,956.95, plus $5,797.38 prejudgment interest.

The verdict was returned just before Christmas 1992, and the trial judge and parties agreed that the jury could be discharged

---

[1] The other defendants and their respective percentages of responsibility were as follows A.C. and S.—Armatemp (3%); Anchor Packing (1%); A.P. Green (11%); Babcock and Wilcox (2%); Burns and Roe—only JCP & L (2%); Combustion Engineering Sticktite and Hilite after 1964 (6%); Condensor Specialties Wizard at Oyster Creek only from 1/1/72 through 1973 (2%); M.H. Detrick HiLite pre 1964 (3%); E & B Mill Supply (0%); Elizabeth Industrial Supply Guyon Pipe (3%); Fibreboard Corp.—Pabco Caltemp (5%); Flexitallic Gasket Co. (1%); GAF/Ruberoid—Calsilite (3%); Garlock Gasket (1%); Industrial Welding and Supply (0%); Janos (0%); Keene Corporation—Baldwin Hill (3%); Madsen & Howell (3%); National Gypsum—Goldbond Spackle (0%); Owens–Illinois—Kaylo (1%); Pittsburgh–Corning—Unibestos (7%); Porter–Hayden (14%); Quigley Company—Insulag (12%); Raritan Supply Co. (0%); Robert A. Keasby (0%); State Insulation (0%); United Conveyor Corp.—Nuvaseal (5%); U.S. Gypsum—last manufactured 1950 (0%); Worthington Pump (1%); York Industries (0%).

with a new jury to be selected for the punitive damages phase of the case. Given the agreement of the parties and the fact that neither is in a position to challenge the ruling, we will not comment extensively upon the departure from the usual practice of retaining the same jury to hear both the compensatory and punitive damages aspects of any litigation. Since the trial of this case, the Supreme Court in *Herman v. Sunshine Chem. Specialties, Inc.*, 133 *N.J.* 329, 346, 627 *A.*2d 1081 (1993) determined that the procedure set forth in the Product Liability Act, *N.J.S.A.* 2A:58C–5, should be followed in all punitive damages cases. This procedure calls for a single jury to hear both the compensatory and punitive damages phases of a case.

The punitive damages phase of the trial commenced March 31, 1993, and after sixteen days of trial, the jury returned its $15,000,000 verdict. After an unsuccessful motion to disqualify the trial judge and other motions relating to protective orders concerning certain memoranda admitted in evidence, the judge heard defendant's motion for a new trial or remittitur. The judge granted the motion and entered a remittitur to $2,500,000. Plaintiff's acceptance of the remittitur did not prevent her cross appeal from the remittitur order once defendant determined to appeal from the denial of its new trial motion. *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 595–596, 379 *A.*2d 225 (1977).

Unlike the focus in the *Ripa* and *Schiavo* cases, the punitive damages phase of this trial concentrated upon Owens–Corning's actions to remove asbestos from Kaylo, its knowledge of the potential danger posed by Kaylo, and the manner in which it eventually labeled containers of Kaylo. There were references to the pre–1960 era, central to *Ripa* and *Schiavo*, before decedent's exposure to Kaylo, but these references were mainly to provide background to plaintiff's proof of Owens–Corning's alleged efforts to minimize the public awareness of Kaylo's harmful effects or, as defendant alleges, its efforts to warn the consuming public of Kaylo's dangers.

While the Saranac studies, so central to our reversal in *Ripa*, were again admitted, albeit with a slightly improved foundation in this case, the effect of these studies was negligible given the later information acknowledged to be available to Owens–Corning. This admission without a solid foundation was clearly harmless error, if error at all.

It was generally conceded that by the 1940's asbestos was known to be connected with health problems, notably asbestosis. The preliminary Saranac report did not implicate Kaylo as a carcinogen, but the dangers were apparently recognized by Owens–Illinois, the previous manufacturer of Kaylo and for whom Owens–Corning acted as distributor. Before Owens–Corning assumed the manufacture of Kaylo in 1958, it commenced a Union campaign to extol the benefits of fiberglass and to impress asbestos workers with the benefits of fiberglass over asbestos which involved the danger of asbestosis. Although for its own workers Owens–Corning required the wearing of respirators, required annual chest x-rays, and acknowledged a latency period of up to twenty years for the manifestation of asbestosis, its sales literature touted Kaylo as "non-toxic." In a February 1956 letter to Owens–Corning's Director of Personnel and Industrial Relations, the director of the Saranac study obliquely mentioned "that asbestos is fairly well incriminated as a carcinogen." Owens–Corning's own expert in asbestos disease disputed this link but acknowledged a 1955 study of English workers who had died of asbestosis and had shown an increase in the incidence of lung cancer.

By the early 1960's, however, the published material concerning the link between asbestos and cancer had continued to expand. In 1965, Dr. Irving Selikoff published his first study that insulators working with asbestos were at risk of developing asbestosis, lung cancer and mesothelioma. Owens–Corning's response was to find "some way of preventing Dr. Selikoff from creating problems and affecting sales." Kaylo was a profit leader among defendant's products. As a matter of fact, a non-asbestos insulating product, Multi–Temp, was developed during this period, but Owens–Corn-

ing determined to drop the line because it lacked good profit margins and customer acceptance.

In 1966, Owens–Corning first stamped Kaylo boxes with a notice:

THIS PRODUCT CONTAINS ASBESTOS FIBER.

If dust is created when this product is handled, avoid breathing the dust.

If adequate ventilation control is not possible, wear respirator approved by the U.S. Bureau of Mines.

By February 1967, the notice was printed on the cartons, and in 1970 the label was changed to read:

## CAUTION

CONTAINS ASBESTOS FIBER. INHALATION OF DUST IN EXCESSIVE QUANTITIES OVER LONG PERIODS OF TIME MAY BE HARMFUL. AVOID BREATHING DUST. IF ADEQUATE VENTILATION IS NOT POSSIBLE, WEAR RESPIRATORS APPROVED BY THE U.S. BUREAU OF MINES FOR PNEUMOCONIOSIS PRODUCING DUST.

However, Owens–Corning's promotional literature from this period does not address health concerns.

Commencing in 1968, Owens–Corning started an internal project to remove asbestos from Kaylo. This was not accomplished, however, until 1972 when the product was renamed "10AF." Even after Owens–Corning labeled its product as "asbestos free," the testing of the product as late as 1984 still revealed a "low concentration of amosite asbestos in the Kaylo material."

Plaintiff expanded upon Owens–Corning's knowledge of the harmful propensities of its product. Plaintiff attempted to show through internal Owens–Corning documents that it had knowledge of health problems among its own workers. It introduced various memoranda, two of which were actively challenged in the trial court and again on appeal, as they have been in courts throughout the country. One objection was addressed to the Briley memoranda and to another memorandum from C.D. Callender, an in-house Owens–Corning attorney, all of which were admitted into evidence. On defendant's motion, however, they were covered by a protective order that has continued through this appeal.

After a discussion at oral argument before this court, however, Owens–Corning has reconsidered its position on the Briley memoranda. By letter dated June 7, 1995 addressed to this court, relating to defendant's failure to assert its alleged privilege in a New York action in which the Briley memoranda were admitted into evidence, Owens–Corning has withdrawn its "privilege claim as to the Briley memoranda." It has, however, pressed its claim concerning an unredacted version of the Callender memorandum.

The issue before us, treated *infra*, is not the admission of a redacted Callender memorandum admitted in other cases, but rather the admission of the unredacted memorandum containing its suggestions for action concerning disclosure of early asbestos claims in workers' compensation proceedings which allegedly had not been followed in the case before us. Although this memorandum was received under a protective order which still stands, and we have not seen fit to quote it in its entirety, it is fully in the public eye. Before it became the subject of a protective order in another case, it had been widely disseminated and, in fact, had been published in full in *Mealey's Litigation Reports on Asbestos,* September 18, 1992. While interrogatory answers were finally updated throughout the country in many cases in 1991, by that time the underlying files referred to in the Callender memorandum had been lost or destroyed and were thus unavailable for use in any pending litigation.

### A.

Defendant first claims that any award of punitive damages in this case violates New Jersey law in that it was no longer needed to punish or deter defendant or others for asbestos-related conduct and could deprive future plaintiffs of a source of compensatory damages. These issues were treated in *Ripa v. Owens–Corning, supra,* 282 *N.J.Super.* at 395–398, 660 *A.*2d 521. We likewise reject defendant's arguments that the award of further punitive damages violates the United States and New Jersey Constitutions. *Ibid.*

*B.*

In this case, defendant argues that the sheer size of the $15,000,000 punitive damages award indicated that the jury had misinterpreted its role and that the verdict had been the product of passion or prejudice. Defendant urges that the award was disproportionate to its conduct, to the compensatory damages award and to prior punitive damages awards against defendant in similar cases where its percentage of responsibility had been considerably higher. It attributes the jury's actions to erroneous instructions that failed to apprise the jury that the punitive damages award must be reasonably related to the compensatory verdict.

The total compensatory award to plaintiff, before prejudgment interest, was $72,956.95. But the wrongful death portion of the compensatory award against all of the defendants was $382,000, eleven percent of which was $42,020. Therefore, defendant's share of the total award, less the wrongful death component, was approximately $31,000.

Initially, the court charged the jury that the punitive damages, if awarded, "should bear some reasonable relationship to the plaintiff's actual injury, although there is no set ratio between punitive and compensatory damages." Defendant took exception to this charge and requested that the jury be charged that punitive damages should bear a reasonable relationship only to decedent's lifetime injuries and not to the wrongful death award. After research, the trial judge determined to reinstruct the jury on the issue, noting to defendant that the court's initial problems related to defendant's own request to charge which had used the $72,000 rather than the $31,000 figure. The court called the jury back from its deliberations to explain that the wrongful death element was not to be considered when calculating any punitive award. The charge, however, was still ambiguous. The court nevertheless stated that the wrongful death statute did not permit punitive damages, but that suits for pain and suffering and loss of

consortium, which are the lifetime claims of a party, do permit the award of punitive damages.

The judge, however, also rejected defendant's claim that the jury again be told of the breakdown of the original verdict among the various original defendants and that Owens–Corning had only been responsible for eleven percent. The charge as originally given and even as supplemented might well have been confusing to the jury. During the recharge, the jury was told that the award was to be based upon decedent's injury, yet it was told that the wrongful death statute did not permit punitive damages. The ultimate injury suffered by decedent was his death. This had the capacity to create some confusion.

The greater confusion we see, however, was the focus of the charge on the injuries to decedent for which decedent had already been fully compensated. The principal emphasis setting the amount of a punitive damages award is on its effect on the tortfeasor, not the harm to the victim. While there should be some relationship between the award and the injuries suffered as well as between the award and the compensatory damages, the factors described in *N.J.S.A.* 2A:58C–5b and –5d relate to the defendant. *See also Fischer v. Johns–Manville Corp.,* 103 *N.J.* 643, 673, 512 *A.2d* 466 (1986).

We acknowledge that, based upon the evidence presented in this case, defendant could also not have fared well if the jury had been instructed to consider the elements set forth in the statute. The statutory non-exclusive listing of elements that a jury should consider in determining whether to award punitive damages at all includes:

(1) The likelihood at the relevant time that serious harm would arise from the tortfeasor's conduct;

(2) The tortfeasor's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the tortfeasor's conduct;

(3) The conduct of the tortfeasor upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the tortfeasor.

[*N.J.S.A.* 2A:58C–5b.]

Once the jury determined to award damages, the jury could consider:

[ (1) The subsection b factors];

(2) The profitability of the misconduct to the tortfeasor;

(3) When the misconduct was terminated; and

(4) The financial condition of the tortfeasor.

[*N.J.S.A.* 2A:58C–5d.]

Plaintiff's summation did concentrate in part on defendant, its actions, and its net worth, all proper under the statute. The problem, however, is that the jury was also exhorted to make Owens–Corning pay in this case for what it did to all of those injured by Kaylo, and the focus was not only upon the lifetime injuries for which damages were properly recoverable, but also on the death claim. Plaintiff's attorney stated:

> In deciding the amount in this case, if you should decide that they should pay punitive damages, you have to focus on a number of things. And the judge will talk to you about them. The severity of the injury. I submit to you that there's no more severe injury than death. And this has happened to thousands of workers. Their own financial statements say that tens of thousands of workers have been hurt.

Later he stated:

> Whatever decision you make, you're going to send Owens–Corning Fiberglas a message. If you find them not responsible, they will hear a message that their conduct past and present is excusable, that what they did to Mr. Jadlowski and others is okay. Maybe more importantly, they'll hear that it is okay to do the same thing with another product in the future.
>
> If you find them responsible, they'll get the message stop paying the lawyers, start paying the victims. If you still have asbestos in that Kaylo, get it out. That's the message they'll get.
>
> What you did was wrong will be the message they get. They'll get a message that we here in Middlesex County want confidence that the products that we buy are safe. That we here in Middlesex County want confidence that the workplace is safe.
>
> If you should find that punitive damages are appropriate, the message has to be loud and it has to be clear. A small slap on the wrist is not going to affect this billion dollar company. They'll spend another billion to fight these cases, to come in here and say they didn't know. Let this be the last case that this is done in.
>
> Send a message to Toledo, the tower, that says to Owens–Corning and to the Owens–Cornings of the world that in New Jersey we won't tolerate it anymore.

The rhetoric is excellent, but its aim was for the jury to punish Owens–Corning in this case for what it did in all cases. The sheer size of the verdict demonstrates to us that the jury perceived its role as punishing Owens–Corning for the course of conduct that was demonstrated in this case that affected tens of thousands if not hundreds of thousands of workers. As we explained in *Ripa*, such awards lead to anomalous results. *See* 282 *N.J.Super.* at 397–398, 660 *A.*2d 521.

■ The trial judge applied remittitur to a verdict that was beyond all reasonable relationship to the $31,000 compensation for lifetime injuries the original jury had awarded to plaintiff. Defendant's conduct was clearly found to be reprehensible, and defendant was found to be able to withstand a substantial punitive award. But the relationships between these factors had completely broken down, showing this jury award to have been the result of prejudice, partiality or passion. As was noted in *Taweel v. Starn's Shoprite Supermarket*, 58 *N.J.* 227, 276 *A.*2d 861 (1971), a court can grant remittitur only to avoid a new trial on damages. However, if the award of damages "is so grossly excessive as to demonstrate prejudice, partiality or passion and thus to generate the feeling that the entire verdict was tainted, a remittitur is improper." A new trial therefore must be ordered on the punitive damages issue. *Id.* at 231, 276 *A.*2d 861; *Henker v. Preybylowski*, 216 *N.J.Super.* 513, 517–518, 524 *A.*2d 455 (App.Div.1987).

■ We also cannot sustain the remitted amount set by the trial judge. The trial judge expressly set the remittitur award at what he considered to be "the proper measure of punitive damages for the death of a human being." Yet punitive damages are not awarded for a wrongful death. The punitive damages award is not to be considered compensatory, and defendant in this case was found responsible for only eleven percent of the damages to plaintiff. We therefore must also reject the amount set by the trial judge, even if we had concurred in his determination that the $15,000,000 award had not been the result of passion or prejudice.

The Supreme Court in *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 *U.S.* ——, ——————, 113 *S.Ct.* 2711, 2720, 125 *L.Ed.2d* 366, 379–380 (1993) and in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 *U.S.* 1, 18, 111 *S.Ct.* 1032, 1043, 113 *L.Ed.2d* 1, 20 (1991) required appellate review of the reasonableness of punitive damages awards as a condition to sustaining their constitutionality. This review was also recognized in *Herman v. Sunshine Chem. Specialties, Inc., supra*, 133 *N.J.* at 338, 627 *A.2d* 1081. New legislation prospectively directs such review in all cases filed on or after October 27, 1995, which is 120 days after the enactment date of June 29, 1995, and defines the trial judge's authority to reduce or eliminate the punitive damages award. *L.* 1995, *c.* 142 § 6a.

In *Ripa* we suggested alternatives to the present system. *See* 282 *N.J.Super.* at 398 n. 8, 660 *A.2d* 521. Were it within our power, we could impose a punitive award ourselves, after consideration of the statutory and common law factors which relate to defendant's conduct in inflicting its share of lifetime injuries on decedent. Yet we perceive that we have no authority to do so under the present law which leaves this function to a jury, subject to remittitur in appropriate cases and appellate review of the result.[2] We therefore are constrained to remand this matter for a new trial on punitive damages.

Since this case may well be retried, we must also pass on some of the other principal issues raised by defendant.

---

[2] Under *L.* 1995, *c.* 142, approved June 29, 1995, the "Punitive Damage Act," the subject of punitive damages for cases filed 120 days after October 27, 1995 will be governed by a single comprehensive statute. With certain stated exceptions, the Act limits punitive damages to "five times the liability of that defendant for compensatory damages or $350,000, whichever is greater." *L.* 1995, *c.* 142, § 6b. The procedures for a bifurcated compensatory/punitive damages consideration before the same jury contained in *N.J.S.A.* 2A:58C–5 are expanded to include all claims for punitive damages, as previously directed by *Herman v. Sunshine Chem. Specialties, Inc., supra., L.* 1995, *c.* 142, §§ 4–5. The standard of proof is elevated to clear and convincing evidence. *L.* 1995, *c.* 142, § 4a. Pending federal tort reform legislation may further preempt otherwise applicable state law.

## C.

Defendant asserts that the admission of the unredacted Callender memorandum materially prejudiced its rights. The redacted portion of the Callender memorandum which Owens–Corning admits has been received in evidence in several other actions and thus is clearly free of a claim of privilege, reveals that on October 14, 1980, Callender, addressing another in-house attorney, outlined the discovery of old workers' compensation records in California. This three paragraph portion of the memorandum reads:

In May, 1979, some Worker's Compensation files were discovered by a plaintiff's attorney. Those Worker's Compensation cases number 51 and most of the cases were filed in California. Those files which were certified records of the Bureau of Worker's Compensation in the various states disclosed that OCF was named as a defendant in 24 cases. The only correspondence in any of the files involving OCF was in Irvey O. McCarroll's file. In that file there was a letter from C.L. Flowers, Office Manager, Fiberglas Engineering Supply Division, Telegraph Road, Los Angeles, California, to a Mr. John Andres of the Los Angeles, California Aetna office. This particular letter indicates that the claimant was never employed by Fiberglas Engineering & Supply. There were in two other files, Groenthal and Curtis, in which OCF was very much involved in the BWC litigation. A further review was conducted in which the Law Department was told that no Worker's Compensation files existed in Santa Clara nor did they exist in the Contract Units of the Pacific Coast Division. This reaffirmed a belief that OCF was not aware of the fact that Worker's Compensation cases involving asbestosis claims had been filed against OCF.

During a trip to the Los Angeles Contract & Supply Division, an interview was held with Joe Smolich who indicated that he was, in fact, aware of Worker's Compensation cases filed against OCF alleging asbestos-related claims as early as 1955 to 1960. However, there was still no documentation to substantiate Mr. Smolich's recollection.

In a recent trip to the Santa Clara plant, a preliminary review was conducted of Law Department files located in the storage area above the Santa Clara plant. In those files was a file entitled "Worker's Compensation 1962–1967." That file contained at least five files that were in the initial list of Worker's Compensation cases discovered by the plaintiff's attorney. That file also contained various correspondence from the Department personnel in Santa Clara in the early 1960s. That correspondence indicates that there were, in fact, asbestosis related Worker's Compensation claims, as well as specific claims for lung cancer. That file also contained information directed to Toledo regarding asbestos-related Worker's Compensation claims. The earliest claim filed that was found in Santa Clara was a claim of a James Whitcomb Riley which was filed in 1957, but the earliest document in the file for OCF is 1959.

The balance of the memorandum clearly contains opinions of counsel and suggestions for internal action.

This memorandum's chief probative value, however, did not just concern the corporate knowledge of the asbestosis and cancer claims from the 1960's. The same C.D. Callender was the signatory on the interrogatories in the present case, and in that capacity he disclaimed knowledge of the very cases his early memo had described. Thus, plaintiff argued that a conspiracy of silence and even active obfuscation continued down to the present time. It is true that interrogatories throughout the country in the thousands of pending Owens–Corning cases had been amended in recent years to include the information concerning the California experience in the 1960's. As related to this case, however, plaintiff claimed righteous indignation over being denied full and timely discovery.

■ We have deleted the obvious opinions of the attorney and advice given to Owens–Corning. We do not hesitate to discuss the import of the balance of the memorandum, since, as we have already noted, the memorandum has been published in full for the edification of the asbestos Bar. The issue, however, is not the confidentiality of the memo but its admissibility which is limited under the attorney-client privilege pursuant to *Evid.R.* 26 (*N.J.R.E.* 504) (*N.J.S.A.* 2A:84A–20). The public knowledge of the contents of the document is a result of an erroneous out-of-state order that admitted the entire document but was thereafter reversed with a direction that previously distributed copies of the order be retrieved. Although this proved impossible, the ensuing publication of the order falls within *Evid.R.* 38 (*N.J.R.E.* 531) (*N.J.S.A.* 2A:84A–30) which provides: "Evidence of a statement or other disclosure is inadmissible against the holder of the privilege if the disclosure was wrongfully made or erroneously required." Owens–Corning thus has the right to be protected against the admission of the privileged portion of the Callender memorandum, even though there is no question that it is no longer confidential.

The memorandum acknowledged that the information concerning defendant's California asbestosis and lung cancer claim experience prior to 1970 had rendered incorrect defendant's interrogatory answers previously given in the many thousands of cases around the country. It urged Owens–Corning to amend its interrogatory answers to correct the error. It is ironic that the author of the memorandum was the same individual who omitted and feigned ignorance of this identical information in his answers to interrogatories in the present case. There was, therefore, some effect in this litigation by admitting the entire memorandum.

■ The communication privilege between corporate counsel and the client is enforceable to foster "full and frank communication between attorneys and their clients...." *Upjohn Co. v. United States*, 449 *U.S.* 383, 389, 101 *S.Ct.* 677, 682, 66 *L.Ed.*2d 584, 591 (1981). The privilege is "exceedingly important" but not "sacrosanct." *In re Kozlov*, 79 *N.J.* 232, 242, 398 *A.*2d 882 (1979). There are times when the privilege must give way to a full and fair inquiry. *See United Jersey Bank v. Wolosoff*, 196 *N.J.Super.* 553, 564–567, 483 *A.*2d 821 (App.Div.1984).

In the case before us, Callender answered later interrogatories as a representative of the corporation. These later answers may have served as evidence of a fraud by Owens–Corning. One way to prove plaintiff's claim of fraud was to show that the corporation indeed had contrary information six years before the interrogatory answers were rendered. Thus, plaintiff sought to introduce Callender's memorandum containing this contrary information even though in the writing of the memorandum he was acting as an attorney giving advice to his client. The solution in the situation would have been to redact the memorandum, separating the factual statements from the advice. *Cf. United Jersey Bank v. Wolosoff*, 196 *N.J.Super.* at 567–568, 483 *A.*2d 821. This solution has been acceded to by defendant in several other cases and has been offered here.

Since we are remanding this matter for retrial, we need not determine here whether this error in admitting the balance of the

memorandum was harmless or not, or whether the privilege was lost by disclosure in other jurisdictions. It is impossible to know the effect upon this jury if it had only received the redacted version of the Callender memorandum. On the one hand, Callender's redacted memorandum would have shown that he had the information that was not revealed in his interrogatory answers. Once the jury heard this, Callender's later answers were shown to be false. On the other hand, the fact that he gave direct advice to amend existing answers lent more weight to this argument; how much more, we cannot know. On remand, if the memorandum is again offered and the privilege has not been lost in the interim [3], it should be redacted before admission.

## D.

Defendant objected to the jury being informed of the details of decedent's injuries prior to his death. Of course, if this case had been tried as two parts of a single action, commencing with compensatory damages, this problem would have been avoided. *Herman v. Sunshine Chem. Specialties, Inc.*, supra, 133 *N.J.* at 338, 627 *A.*2d 1081, and *Fischer v. Johns–Manville Corp.*, supra,

---

[3] We have been informed that there have been or are now pending some fifteen other cases in which this issue has been raised and in none of them has the unredacted memorandum been admitted. However, defendant also informs us "that Owens–Corning has been sued in approximately 255,000 asbestos personal injury cases of which approximately 106,000 are currently pending ... [and] has responded to discovery in many thousands of cases, and has been involved in the trial of more than 2,000 cases." We cannot predict how this issue may be treated in any one of these situations where the privilege might be lost.

Since oral argument, we have been specifically advised by plaintiff that in a Hawaii case, *Miyashiro v. Owens–Corning Fiberglas Corp.* No. 92–4639–12 (Cir. Ct.Haw.1993), the Callender memo was admitted in full, without objection. Thus plaintiff claims the privilege was lost. There allegedly was a similar ruling in a Colorado case in 1993, but there is no further information available. Defendant asserts that in the Hawaii case the record is unclear in that the motion to strike was denied under an idiosyncrasy of Hawaii law that should not prejudice it in future cases. We do not resolve this issue here as it has not been fully briefed and argued before us.

103 *N.J.* at 673, 512 *A.*2d 466 make it clear that the punitive damages award must bear some relationship to the actual injuries suffered. Therefore, there is no question that the jury should be informed of the extent of decedent's injuries. Some of the evidence was cumulative, however. The testimony to a large extent focused on different time frames of decedent's injuries. His videotaped deposition and plaintiff's testimony gave the jury a complete perspective on the nature of the injury in all of its phases.

Defendant also objects to the admission of the depositions of Thomas and Hill. The issue of the Thomas deposition was discussed in *Ripa* 282 *N.J.Super.* at 406–407, 660 *A.*2d 521. We adhere to that analysis.

■■ Hill was a former lineworker performing packing duties in defendant's Berlin plant during the 1960's. In a deposition (he is now deceased), he recalled that he had never seen a warning label on a Kaylo box. Defendant objected, noting that a foundation was not established for this testimony in that it was not shown that Hill was ever in a position to see a label. The decision to admit this evidence rested in the sound discretion of the trial court, and the judge's decision will not be disturbed unless manifestly unjust. *Ratner v. General Motors Corp.,* 241 *N.J.Super.* 197, 202, 574 *A.*2d 541 (App.Div.1990). While it is possible that all of the boxes with which Hill had worked may have been positioned so that Hill could not see the warning label, a jury was free to make reasonable inferences from the testimony presented. Defendant was permitted to offer additional deposition testimony by Hill that he had smoked in the 1960's but did not remember warnings on the cigarette packages from that period. We see no error on this point.

### E.

As in the *Ripa* and *Schiavo* cases, defendant argues here that the burden of proof for punitive damages should be "clear and convincing" and not a "preponderance of the evidence." As we

noted in both of these cases, this is a matter for the Legislature which had previously chosen the preponderance of the evidence standard for product liability cases or the Supreme Court which left the matter open in *Fischer* and adopted the Product Liability Act's standard in *Herman.* *See Ripa, supra,* 282 *N.J.Super.* at 403, 660 *A.2d* 521.[4]

F.

The next point is unique to this case. In order to determine how other courts had treated the Callender and Briley memoranda (also called the Konzen memos because Konzen was another recipient of some of the workers' compensation status reports), the trial judge had spoken to a colleague at a conference who in turn had mentioned the matter to a judge of the Superior Court of the State of Washington. That judge placed remarks concerning the conversation on the record in another asbestos case. The comments related to the memoranda being admitted at trial in the State of Washington under the fraud exception to the attorney-client privilege. *See Evid.R.* 26(2)(a) *(N.J.R.E.* 504(2)(a)) *(N.J.S.A.* 2A:84A–20(2)(a)). The Washington judge stated that the trial judge in this case had described a "pattern of concerted nondisclosure," but the Washington judge also told counsel in that case that he was

> not saying that [the trial judge here] says he has drawn conclusions. I am not familiar with the exact nature.... It may well be all of this was presented to the jury and the jury is the one that drew the conclusions or made the findings in effect of some improper action, and all he was doing was recounting them to me.... So I don't want to put him in the role of an advocate.

On the basis of this conversation between the Washington judge and the trial judge here, defendant requested that the trial judge recuse himself in that he had "given his opinion upon a matter in question in the action" in contravention of *R.* 1:12–1(d). The trial

---

[4] As noted earlier, the Legislature has prospectively raised the standard of proof for cases filed on or after October 27, 1995 to "clear and convincing" evidence. *L.* 1995, *c.* 132, § 4a.

judge held extensive argument on the subject and disputed offering any opinion on the case. He denied the motion for recusal.

Recusal rests in the sound discretion of the trial judge. *Magill v. Casel,* 238 *N.J.Super.* 57, 63, 568 *A.*2d 1221 (App.Div. 1990). The trial judge is in as good a position as any to evaluate a claim that an action has the appearance of impropriety. *Ibid.* Indeed, it is improper to grant a recusal motion unless the alleged ground is true. *Hundred East Credit Corp. v. Eric Schuster Corp.,* 212 *N.J.Super.* 350, 358, 515 *A.*2d 246 (App.Div.1986), *certif. denied,* 107 *N.J.* 60, 61, 526 *A.*2d 146 (1993). The trial judge showed no partiality during the trial, and the outcome of the post-trial motions, especially the remittitur motion, actually favored Owens–Corning. We recognize that the motion for a new trial was based in part on the premise that the Briley and Callender memoranda were erroneously admitted. This of course was not lost upon the trial judge, and he determined, after considering all the facts, to deny the recusal motion. We find no error. We also note that the issues concerning these memoranda have been greatly defused since the time of trial.

## G.

Lastly, we will consider defendant's arguments relating to plaintiff's summation. We have already treated the summation insofar as its focus combined with the judge's charge to permit the jury to return a verdict on issues outside the ambit of this case. There were, however, other issues.

Plaintiff's counsel mischaracterized the expenditures of defendant in the defense of asbestos litigation. While there was a reference in the McOmber affidavit that defendant has set aside a billion dollar reserve to cover uninsured claims, this was mischaracterized by plaintiff's counsel as defendant spending "more than a billion dollars paying their lawyers to come into court and say they did not know. A billion dollars." He later argued for a substantial punitive damages award, stating that such an award will cause defendant to "stop paying their lawyers [and] start

paying the victims." We have already noted this argument to have been forceful advocacy. Even though it may have had an incorrect premise, the jury was instructed to rely upon its own recollection of the facts and not the recollection of the attorneys. While plaintiff's statement of a billion dollars in litigation expenses might well have been corrected, we do not see this as reversible error. Insofar as the argument suggested that Owens–Corning was not entitled to expend reasonable funds to retain counsel, it was improper and should not be repeated.

■ Nor do we find erroneous the references made by plaintiff's counsel to the fact that punitive damages are not covered by insurance. Although this would normally be a dubious argument, it here was fair comment on the evidence. *See Tonsberg v. VIP Coach Lines, Inc.*, 216 *N.J.Super.* 522, 530, 524 *A.*2d 460 (App.Div. 1987). Defendant had already noted that it had set aside a reserve for uninsured claims, and thus it was fair to tell the jury that punitive damages would not diminish defendant's insurance coverage. Insofar as the argument suggested that Owens–Corning was not entitled to expend reasonable funds to retain counsel, it was improper and should not be repeated.

Thus, with the exception of the summation issues we have earlier discussed, we find no error in the summation which would separately have required a reversal.

The judgment awarding punitive damages, as remitted, is reversed, and the matter is remanded for a new trial on punitive damages.