694 A.2d 319

NATIONAL UTILITY SERVICE, INC., PLAINTIFF–RESPONDENT, v. SUNSHINE BISCUITS, INC., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided June 6, 1997.

Before Judges PRESSLER, STERN and HUMPHREYS.

*Brian J. McMahon* argued the cause for appellant (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. McMahon* and *Patrick C. Dunican, Jr.,* on the brief).

*Peter G. Goodman* argued the cause for respondent (*Kurzman Karelsen & Frank,* attorneys; *Mr. Goodman,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

We granted leave to appeal from orders of the Law Division entered on July 26, 1996 and September 27, 1996, which implemented oral opinions regarding the discovery and use of docu-

ments claimed by defendant to be privileged under the attorney-client privilege. The July 26 order provided that "documents previously produced by [defendant Sunshine Biscuits, Inc.] bearing Sunshine's production numbers [22–24](a) are excluded from the protection of the attorney-client privilege, and (b) may be retained and used by [plaintiff National Utility Service (NUS) ] for any purpose which is permissible under the New Jersey Rules of Court and Rules of Evidence." The order also required Sunshine to "produce for *in camera* review by [the Law Division] the original unedited documents listed in Sunshine's 'privilege log,' " and directed Sunshine "to submit to discovery by NUS on the privilege issue. . . ." The September 27, 1996 order denied Sunshine's motion for reconsideration and stay and directed compliance with the July 26 order by October 4, 1996.

We reverse and hold that a pre-litigation memorandum prepared by in-house counsel to defendant's Controller is neither discoverable nor subject to use by plaintiff, under the "crime-fraud" exception to the attorney-client privilege, merely because it embodies advice inconsistent with a legal theory thereafter developed by litigation counsel.

Plaintiff alleges that in 1980 it entered into a contract with defendant and, pursuant thereto, made energy audits and recommendations as a result of which defendant saved substantial energy costs and expenses. Plaintiff brought this action to recover fifty percent of those savings pursuant to the contract.

During discovery Sunshine delivered to plaintiff copies of documents including the so-called "Barbieri memorandum," a three page written communication from Sunshine's in-house counsel to its corporate Controller (numbered 22 through 24 in discovery). The memorandum discusses the basis for plaintiff's claims against defendant under the contract and makes "recommendations" for corporate action, investigation of the work actually done by plaintiff and consideration of a "buyout" of the contract. When defendant realized that the documents were included in the discovery presented, it requested the immediate return of the memorandum.

Plaintiff thereupon moved for an order permitting it to retain the memo and to use it in connection with the litigation. The motion resulted in the order of July 26, 1996. Reconsideration was denied on September 27, 1996. Although no *in camera* review of the documents in the "privilege log" ever occurred, we are told that the "Barbieri memorandum" is the only document now in dispute.

Defendant contends that the memorandum, dated December 28, 1992, written approximately three years before the litigation commenced,[1] is privileged and not discoverable, whereas plaintiff insists that it cannot be subject to the attorney-client privilege because it embodies evidence of a fraud. The alleged fraud flows from the assertion in the fifth affirmative defense that there was "no contract" despite corporate counsel's apparent acknowledgment in the memorandum to defendant's Controller that defendant had undertaken a contractual obligation.[2] The fifth affirmative defense provides:

> [t]he relief sought in the Complaint is barred, either in whole or in part, as the defendant has no contractual obligation to and never entered into a contract with National Utility Service, Inc.

The motion judge held that the attorney-client privilege did not apply because of the "crime fraud" exception. He concluded:

> I am satisfied that the defense view of the crime fraud exception is a stunted view, is a tunnel-vision view, and is one that is crabbed in the sense of looking only at what was happening at the time of the execution of the so-called Barbieri memorandum. I think that this case, as all cases, must be looked at as part of a

---

[1] The plaintiff refers to the filing of its First Amended Complaint on February 8, 1996. It does not note when the original complaint was filed. Defendant suggests that the complaint was filed in the fall of 1995. In any event, plaintiff acknowledges that "[i]ssue was joined on February 20, 1996, when Sunshine filed its Answer," affirmative defenses and counterclaim.

[2] The parties agree that the inadvertent disclosure during discovery does not constitute a waiver by the client of its privilege. *State v. Sugar*, 84 *N.J.* 1, 13, 417 *A.2d* 474 (1980); *Trilogy Communications, Inc. v. Excom Realty, Inc.*, 279 *N.J.Super.* 442, 447–48, 652 *A.2d* 1273 (Law Div.1994); *N.J.S.A.* 2A:84A–30; *N.J.R.E.* 531.

continuum, as part of a matrix of process. I am satisfied that in that matrix the Barbieri memorandum plays a role in the claim of fraud or deceit.

Although it becomes fashionable to cite the cliche I'm about to cite, I think it's applicable here. The surest way to misread a rule or a statute is to read it literally, and that is the way I approach Rule 504. Read literally and in that crabbed fashion, I think Sunshine Biscuits is probably correct, but I don't think that's what the intent or spirit is.

Pursuant to *N.J.S.A.* 2A:84A–20, embodied in the Rules of Evidence as *N.J.R.E.* 504:

[C]ommunications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it.... The privilege shall be claimed by the lawyer, unless otherwise instructed by the client or his representative.... [3]

■ There is no dispute that because the Barbieri memorandum was written as part of the duties of in-house counsel who was retained to provide professional legal advice to the corporation, and the memorandum was prepared in furtherance thereof, it is subject to the attorney-client privilege unless an exception applies. *See generally United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 560–63, 483 *A.*2d 821 (App.Div.1984); *see also Jadlowski v. Owens–Corning Fiberglas Corp.,* 283 *N.J.Super.* 199, 215–17, 661 *A.*2d 814 (App.Div.1995), *certif. denied,* 143 *N.J.* 326, 670 *A.*2d 1066 (1996); *Restatement (Third) of the Law Governing Lawyers* §§ 118–122 (Proposed Final Draft No. 1, March 29, 1996). Thus, the only issue before us is whether the memorandum is subject to

---

[3] The terms "lawyer" and "client" are defined in *N.J.S.A.* 2A:84A–20(3) and *N.J.R.E.* 504(3):

As used in this rule (a) "client" means a person or corporation or other association that, directly or through an authorized representative, consults a lawyer or the lawyer's representative for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity; ... (b) "lawyer" means a person authorized, or reasonably believed by the client to be authorized to practice law in any State or nation the law of which recognizes a privilege against disclosure of confidential communications between client and lawyer. A communication made in the course of relationship between lawyer and client shall be presumed to have been made in professional confidence unless knowingly made within the hearing of some person whose presence nullified the privilege.

[*N.J.R.E.* 504(3).]

the "crime fraud" exception. That exception "encompasses a type of communication that is alien to the fundamental reasons that underlie the privilege." *Fellerman v. Bradley*, 99 *N.J.* 493, 503, 493 *A.*2d 1239 (1985); *see also In re Nackson*, 114 *N.J.* 527, 535, 555 *A.*2d 1101 (1989); *Restatement, supra,* § 132.

The Supreme Court has instructed that

[i]n deciding whether the "crime or fraud" exception applies, the relevant factor to consider is whether the client consulted with the attorney in order (1) to aid the client "in the commission of any crime"; (2) to enable the client "to avoid any criminal investigation or proceeding pending at the time the advice was given"; or (3) to assist the client to "avoid lawful process in any proceeding pending at the time the advice was given." Undoubtedly, it can be often a close question whether "the legal service was sought or obtained to aid the client in the planning or perpetration of a crime or a tort."

[*In re Nackson, supra,* 114 *N.J.* at 535, 555 *A.*2d 1101 (internal citations omitted).]

The Court has interpreted the exception broadly:

Confederating with clients to allow court and counsel to labor under a misapprehension as to the true state of affairs; countenancing by silence the violation of a court order and aiding and abetting the continued contempt of another, are all frauds within the meaning of *Evidence Rule* 26(2)(a) [now *N.J.R.E.* 403(2)(a) ]. There is no reason to believe that the use of the word "fraud" in that rule is to be limited to conventional notions of tortious frauds. Acts constituting fraud are as broad and as varied as the human mind can invent. Deception and deceit in any form universally connote fraud. Public policy demands that the "fraud" exception to the attorney-client privilege as used in *Evidence Rule* 26 [now *N.J.R.E.* 504] be given the broadest interpretation.

[*Fellerman, supra,* 99 *N.J.* at 503, 493 *A.*2d 1239 (quoting *In re Callan*, 122 *N.J.Super.* 479, 496, 300 *A.*2d 868, (Ch.Div.), *aff'd*, 126 *N.J.Super.* 103, 312 *A.*2d 881 (App.Div.1973), *rev'd o.g.*, 66 *N.J.* 401, 331 *A.*2d 612 (1975)).]

The *Fellerman* Court also noted "that it was plausible to class 'any use of legal process for a purpose other than a "legitimate" one' to be tortious" and, therefore, subject to the exception. *Fellerman, supra,* 99 *N.J.* at 503, 493 *A.*2d 1239 (quoting G. Harzard, "An Historical Perspective on the Attorney–Client Privilege," 66 *Calif. L.Rev.* 1061, 1064 (1978)).

In this case, the motion judge found that it was fraudulent for defendant to affirmatively defend the contract action by asserting that there was no contract with NUS after in-house counsel had previously indicated in a memorandum that defendant did enter

into a contract with plaintiff. In other words, the judge found that by arguing in its defense that Sunshine did not enter a contract with NUS it "lied" to the court, and that evidence of the lie is contained in the Barbieri memorandum.

In his memo, Mr. Barbieri, Sunshine's General Counsel, considered correspondence with plaintiff as well as the terms and scope of the contract. He further recommended that

> [b]ased upon the results of the above, consider making an offer to buy out the remainder of the contract, employing the sum currently due from Kansas City Bakery as proceeds. The answers to the above questions may provide legal bases for avoiding parts of the contractual obligations (e.g. if Oakland and Columbus never communicated with NUS, the contract may not apply to either).

Defendant insists that the memo was written in good faith and embodied sound legal advice. Defendant also asserts that the fifth affirmative defense was developed as a result of a further review of the merits and study of the law of Delaware which it contends controls under choice of law principles.

According to defendant:

> [the] defense has two components. First, the defendant asserts that it has no contractual obligation to NUS.... In its Response to Plaintiff's First Set of Interrogatories, Sunshine explained that Paul Marino, a NUS employee, admitted in a letter to Edward Goldman of American Brands, Inc., the former owner of Sunshine Biscuits, Inc. that Sunshine Biscuits "no longer wished to receive any NUS recommendations and thereby terminated the agreement." ... Thus, Sunshine *had no contractual obligation* to plaintiff as recognized by plaintiff's own employee, Paul Marino.

Defendant thus asserts that if, in fact, there was no contract there could be no fraud.

Defendant explains the second basis for the fifth affirmative defense, as follows:

> NUS never entered into an agreement with this Sunshine Biscuits, Inc.... Sunshine appropriately interposed the defense that it "never entered into" a contract with NUS because *this* Sunshine did not do so.... [W]hile NUS may or may not ultimately carry its burden and demonstrate that "New Sunshine" can potentially be held liable for Old Sunshine's contract from a successor liability perspective it will *not* be able to demonstrate that it "entered into a contract" with New Sunshine. A review of Delaware corporate law as applied to the facts of this case supports this conclusion.

. . . .

The determination of New Sunshine's successor liability for any contract between Old Sunshine and NUS should be left for a timely and proper summary judgment on another day after discovery has been conducted. Respectfully, it has nothing to do with the application of the crime fraud exception.

According to Sunshine, "[b]y means of a Stock Sale Agreement dated February 8, 1988, as amended by an Agreement dated April 15, 1988, defendant American Brands agreed to sell and GF Industries, Inc. ('GFI') agreed to purchase all of the issued and outstanding shares of common stock of Sunshine Biscuits, Inc." Sunshine relies on the Delaware Code, 8 *Del.Code Ann.* § 259, as interpreted by its state courts, to argue that the new corporate entity as a matter of law entered into no agreement with plaintiff and cannot be responsible for its predecessor's contractual liability.

The trial court has not addressed these legal and factual issues. It may be that they will ultimately turn out to be meritless and that sanctions may even be imposed. *See R.* 1:4–8. But the initial reaction of in-house counsel cannot be deemed to bind the legal and factual contentions raised by the attorneys retained to defend the litigation. The defenses asserted by litigation counsel appear to be made in good faith, *see R.* 1:4–8; *R.* 4:5–3; *R.* 4:5–4, and plaintiff has not made a sufficient showing to the contrary. "The burden of establishing the elements of the ['crime fraud'] exception is upon the person seeking to overcome the privilege." *Restatement, supra,* § 132, cmt. a; *see also id.* at cmt. e. "The person seeking access to the communication ... must present a prima facie case for the exception" to apply. *Id.* at cmt. f. "The showing must be made by evidence other than the contested communication itself." *Ibid.* Plaintiff has not sustained that burden.

We thus conclude that the Barbieri memorandum, prepared over three years before the litigation, by in-house counsel laying out an approach to be taken with respect to resolving a contract dispute, and not suggesting the development of false information

or facts, is not discoverable or subject to use by plaintiff as a communication in furtherance of a crime or fraud merely because trial counsel asserted an affirmative defense arguably inconsistent with the legal position embodied in the memo.

The orders under review are reversed, and the matter is remanded for further proceedings consistent with this opinion.